**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **ROBERT LAMBERT, SR., personal** ) | |
| **representative for ROBERT LAMBERT, JR.,** ) | |
| **Deceased,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| **vs.** ) | **NO. 3:05-1045** |
| ) | **Judge Trauger** |
| **HUMPHREY'S COUNTY SHERIFF,** ) | **Magistrate Judge Griffin** |
| **RONNIE TONGUETE, DEPUTIES JEREMY** ) | **JURY DEMANDED** |
| **WHEELER AND ERIC JERNIGAN,** ) | |
| **BONNIE ROBINSON AND OTHER JOHN** ) | |
| **DOE DEPUTIES OF THE HUMPHREY'S** ) | |
| **COUNTY SHERIFF'S DEPARTMENT,** ) | |
| **HUMPHREY'S COUNTY, TENNESSEE,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

Come now the Defendants, by and through counsel, and respectfully submit the following Memorandum in Support of Summary Judgment.

### Facts

The Decedent, Robert Lambert, Jr. was arrested by deputies with the Humphreys County Sheriff's Department on March 21. 2005. Facts at ¶ 1. At the time he was booked into the jail numerous questions were asked of him regarding such matters as name, alias, weight, height, home phone, next of kin. Facts at ¶ 2. The Decedent was also asked numerous questions regarding his physical condition such as whether he was on medication, which medication, the name of his physician, whether he had any injuries requiring treatment and whether he was a diabetic or epileptic. Facts at ¶ 3.

The Decedent was specifically asked whether he was suicidal or had any suicidal tendencies at the time of booking by Deputy Ethridge to which he replied in the negative.

Facts at ¶ 4.   The decedent was asked on another occasion by Deputy Baker whether he was homicidal or suicidal.  He indicated that he was not homicidal and upon further questioning indicated that he had been suicidal in the past but did not indicate that he was suicidal at the time.  Facts at ¶ 5.  From the time of his arrest until the time of his death he had been observed by no less than three sworn law enforcement officers.  At no time did the officers become aware that the decedent was suicidal nor did he ever indicate to them that he was currently  suicidal. Facts at ¶ 6.

None of the three officers ever observed any behavior that would have indicated to them that the Defendant was suicidal. Facts at ¶ 7.  He was cooperative with the arresting officer and during booking. Facts at ¶ 8.  During the course of jail operations inmates are checked upon regularly.  The  correctional officers on duty during the night of March 21, 2005 made no less than 6 checks on inmates between 10:30 p.m. and 4:00 a.m.  Facts at ¶ 9.

Despite the fact that the Decedent was placed in his cell with his belt, it was not the policy of the Sheriff's Department that a prisoner be allowed to retain a belt.  To the contrary, it is the policy that the belt and shoe laces be removed  from a prisoner.  Facts at ¶ 10.  Bonnie Robinson, one of the named defendants, never spoke to the decedent, never met him nor did I have any interaction with him prior to discovering him hanging in his cell.  Facts at ¶ 11.  Robinson had no knowledge that the Decedent was suicidal, there was nothing contained in the jail log, the inmates file,   no information was passed on to her by the previous shift that would have indicated he was suicidal such nor did he ever indicate to her that he was suicidal.  Facts at ¶ 12.  Robinson did not perform checks of Mr. Lambert's cell nor was that her responsibility.  Facts at ¶ 13.

When Robinson responded to a disturbance in the cell block where the Decedent

2

was housed, she discovered that he had hanged himself. Facts at ¶ 14. When she checked the cell she discovered the Decedent hanging and she immediately obtained assistance and medical attention was provided to the Decedent, albeit to no avail. Facts at ¶ 15.

Had Robinson known that the Decedent was suicidal additional precautions could have been taken and the appropriate intervention would have been undertaken. Facts at ¶ 16. Two other deputies sued in this action, Jeremy Wheeler and Eric Jernigan never had any interaction with the Decedent until he was found hanging in his cell. Facts at ¶ 17. Their sole action as it relates to this case is helping to remove the Decedent from the hanging position and provide appropriate medical treatment. Neither Wheeler or Jernigan had any knowledge of any suicidal tendencies of the Decedent. Facts at ¶ 18.

The Decedent hanged himself with a thick leather belt by weaving that same through grating in the cell. Facts at ¶ 19. The act of weaving the belt through the grating is a voluntary act that would have taken determination on the part of the Decedent. Facts at ¶ 20.

## **Argument**

I.      SUMMARY JUDGMENT STANDARDS.

As provided by Rule 56(c), *Fed. R. Civ. P.*, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202, 211 (1986). In its consideration of the evidence, the court must view all facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party. ***Davidson & Jones Dev. Co.***

3

*v. Elmore Dev. Co.*, 921 F.2d 1343, 1349 (6th Cir. 1991). In order to prevail on summary judgment motion, the moving party bears a burden of proving the absence of genuine issues of material fact concerning an essential element of the opposing party's action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986); *Davidson & Jones Dev. Co.*, 921 F.2d at 1349; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Dispute about a material fact must be genuine, that is "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211-12. The Supreme Court further explained that the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 251-52, 106 S.Ct. at 2512, 91 L.Ed.2d at 214. Since the preponderance of the evidence standard is used in this determination, more than a mere scintilla of evidence in support of the Plaintiff's position is required. *Id.*

Once a Motion for Summary Judgment has been made "the nonmoving party bears a responsibility to demonstrate that summary judgment is inappropriate under rule 56(e)." *Davidson & Jones Dev. Co.*, 921 F.2d at 1349. The nonmoving party may not simply rest on conclusory allegations, but must come forward with some affirmative evidence supporting their claim and establish the existence of a genuine issue of material fact. *Cloverdale Equip. Co. v. Simon Aerial's, Inc.*, 869 F.2d. 934, 937 (6th Cir. 1989). While the disputed issue does not have to be resolved conclusively in favor of the nonmoving party, "sufficient evidence supporting the claimed factual dispute" must be shown to the Court. *Anderson v. Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; *First Nat'l*

4

*Bank v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 80 L.Ed.2d 569, 592 (1968). In the case at bar, Plaintiff, who has the burden of proof, must present sufficient admissible evidence to qualify his case to go to the trier of fact. *Anderson v. Liberty Lobby*, 477 U.S. at 256-57, 106 S. Ct. at 2514. In addition, it is not necessary for the Defendant to negate or disprove the Plaintiff's case, rather the Plaintiff must instead demonstrate that he can make his case with admissible evidence. *See, Lujan v. National Wildlife Fed'n.*, 497 U.S. 871, 110 S. Ct. 3177, 111 L.Ed.2d 695 (1990).

II    THE PLAINTIFF CANNOT PREVAIL AGAINST THE GOVERNMENTAL DEFENDANTS WITHOUT SHOWING THAT A CUSTOM AND PRACTICE CAUSED THE DEATH OF LAMBERT.

Plaintiff cannot prevail on the claims brought against the County and/or Ronnie Toungette in his Official Capacity as Sheriff of Humphreys County ("Official Defendants") under 42 U.S.C. §1983 because they cannot show that a custom and practice of the Official Defendants caused Lambert Jr.'s death. When a section 1983 claim is brought against a governmental entity, two distinct issues must be analyzed: (1) whether the plaintiff's harm was caused by a constitutional violation; and (2) if so, whether the county is responsible for that violation. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). A city or county is responsible for a constitutional violation where a plaintiff shows that a municipal custom or policy caused the alleged violations. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 692-94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As stated by the United States Supreme Court,

> [A] local government may not be sued under Section 1983 for an injury inflicted solely by its employees or agents. Instead it is when execution of a government's policy or custom...inflicts the injury that the government as an entity is responsible under Section 1983.

5

*Monell*, 436 U.S. at 964.  Thus the Plaintiff must show that the policy, custom or practice of the Official Defendants as opposed to the failure of individual defendants to follow the policy, custom or practice is the cause in fact of the injury.

No material issue of fact has been raised regarding any policy, custom, or practice of governmental Defendants.  There is no policy which has been shown to have been the cause of Lambert's suicide.  In the best of scenarios the Plaintiff might be able to show that the failure to follow policy might have been somehow related, ignoring the concept of intervening causes, to the unfortunate death of Lambert.[1]

III.  THE ALLEGED CONDUCT OF THE INDIVIDUAL DEFENDANTS DOES NOT RISE TO THE LEVEL NECESSARY TO SUSTAIN A SECTION 1983 CLAIM.

To establish liability under the Eighth Amendment, Plaintiffs must prove that Defendant acted with "deliberate indifference" to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811, 823 (1994); *Helling v. McKinney*, 509 U.S. 25, 32, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993); *Street v. Corrections Corp. of Am.*,102 F.3d 810, 814 (6th Cir.1996); *Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 79 (6th Cir.1995); *Hill v. Marshall*, 962 F.2d 1209, 1214 (6th Cir.1992), *cert. denied*, 509 U.S. 903, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993).  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention ." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir.2004) (*citing Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir.1990)), *reh'g en banc denied*.

---

[1]     To the extent that the Plaintiff attempts to attach liability to Humphreys County by the alleged action of Ronnie Toungette who was the Sheriff and Chief Jailer at the time, this is addressed in the next section.

6

In the context of a prisoner suicide case, the case law in this circuit has established that psychological needs manifesting themselves in suicidal tendencies are serious medical needs for purposes of the due process analysis. *E.g.*, **Horn by Parks v. Madison County Fiscal Court**, 22 F.3d 653, 660 (6th Cir.), *cert. denied*, 130 L. Ed. 2d 130 (1994); **Barber v. City of Salem, Ohio**, 953 F.2d 232, 239-40 (6th Cir. 1992) (identifying the proper inquiry in suicide cases as "whether the decedent showed a *strong likelihood* that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs"); **Molton v. City of Cleveland**, 839 F.2d 240, 243 (6th Cir. 1988).

"Deliberate indifference" as analyzed by the Sixth Circuit has both an objective and a subjective component. **Comstock v. McCrary**, 273 F.3d 693, 702 (6th Cir.2001). In cases involving an inmate's medical needs, the need "must be, objectively, 'sufficiently serious.'" **Farmer v. Brennan**, 511 U.S. at 834, citing, **Wilson v. Seiter**, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In considering the subjective component, the Sixth Circuit has emphasized that a plaintiff must produce evidence showing "that the official being sued *subjectively* perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." **Comstock**, 273 F.3d at 703 (emphasis supplied). The subjective component requires that the official who actually knew of the serious medical need possessed "a sufficiently culpable state of mind in denying medical care." **Miller v. Calhoun County**, 408 F.3d 803, 812 (6th Cir. 2005).

Nonetheless, there is no general right of pretrial detainees to be correctly screened for suicidal tendencies. **Danese v. Asman**, 875 F.2d 1239, 1244 (6th Cir. 1989), **Bradley v. City of Ferndale**, 2005 WL 2173780 (6th Cir 2005) (attached as exhibit A). Nor has the Sixth

7

Circuit recognized a generalized right of a prisoner to be protected against committing suicide. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1096-97 (6th Cir. 1992). The analysis is typically that the right at issue is the detainee's right to reasonable protection against taking his own life **if that detainee has demonstrated a strong likelihood that he will commit suicide**. Generally, the deliberate indifference issue in suicide cases arises under one of two broad fact situations. First is a suicide or attempt that occurs when jailers failed to discover the decedent's suicidal tendencies. Second is a suicide or attempt that occurs when jailers have discovered the tendencies and have taken preventive measures. The legal inquiry is the same in both sets of cases: whether the jailers were deliberately indifferent to the risk of suicide. However, the Supreme Court has cautioned that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

In the case *sub judice*, there is simply no basis to invoke the right to be protected from one's self sufficient to invoke deliberate indifference analysis. As the facts reveal, the Decedent did not act in a manner that indicated to the Sheriff, the arresting deputy or the deputy who escorted him to his cell that he had suicidal tendencies. Furthermore, he specifically denied that he had such tendencies to the arresting deputy and after more questioning by the deputy who escorted him did not reveal that he had any current tendencies toward suicide.

In *Nance v. Griffin*, 1991 WL 119523 (6th Cir. 1991), the Court of Appeals rejected a claim much more compelling than that before this Court. The facts of *Nance* are set out in the opinion, a copy of which is attached hereto as exhibit B.

8

On December 19, 1985, Knoxville police officers were summoned to a gas station where David Nance was "acting in a bizarre manner, stripping his clothes off, swinging his arms about wildly, not responding to those talking to him, [and] banging on his car[.]". Knoxville city police officers Steven Griffin, Greg Dyke, and Steve Cianciola arrived at the gas station in response to the call, subdued and arrested Nance for disorderly conduct, resisting arrest, and attempted assault, and then transported him to the Knoxville City Jail. When David Nance was taken to the jail, Emma Sue Nance informed the arresting officers and jail officials that David had been in a mental hospital and requested that he be sent to the Veteran's Administration Hospital in Johnson City, Tennessee. Jail officials refused this request.

Bridgette Ann Patterson, a licensed practical nurse working at the city jail, saw David Nance on the morning of December 20, 1985. In response to information she received from night shift workers that Nance "had a mental problem", Patterson called Knox County Mental Health Office coordinator Anne Edens. Edens examined Nance at the city jail on December 20, 1985, to make a preliminary assessment of his psychiatric needs. Edens ascertained that Nance exhibited delusional-paranoid tendencies, and indicated that he required further examination regarding hospitalization for his psychiatric condition. On the same day, Judge Creekmore of the Knox County General Sessions Court ordered a forensic evaluation, rather than a civil commitment evaluation, to determine Nance's competency to stand trial and the possiblity of insanity at the time of the charged offenses. By the terms of the order, Helen Ross-McNabb Center personnel were to perform the evaluation at the city jail and then provide a report to the court by December 30, 1985.

City jail doctor Dennis Drake examined David Nance on December 23, 1985, but Nance largely refused to cooperate in the examination process. Nance did tell Dr. Drake of his stay in a psychiatric hospital, however, and Nance's medical chart further revealed to Dr. Drake that Nance previously had received psychiatric hospitalization on ten occasions. When nurse Patterson called the Knox County Mental Health Center on December 23, 1985, she discovered that the center had no order regarding a mental health evaluation for Nance. Thus, in response to a telephone inquiry, Patterson told Emma Sue Nance that she should "make bond and make arrangements for [David] to go" to a mental health facility of her choice

9

because the jail was powerless to take such action concerning psychiatric treatment without a court order. Despite repeated calls from the jail, Helen Ross-McNabb Center personnel apparently failed to act promptly on the court order for a forensic examination of David Nance. However, Patterson did talk with David Nance at the city jail on December 24, 1985, and again on December 29, 1985, to check on his condition; she found his behavior relatively normal and of no problem to anyone.

After David Nance had been detained in the city jail for more than a week, a "trustee" handing out bed sheets gave one to Nance. Nance hanged himself in his cell at approximately 3:50 a.m. on the morning of December 30, 1985, by using the sheet he obtained from the trustee. While making routine 4:00 a.m. rounds, jailer Marlon Goolsby found Nance hanging in his cell.

1991 WL 119523 at *1-2. of which are discussed above, the Sixth Circuit set out the burden of proof in inmate suicide cases:

In a Section 1983 action against a city for failing to prevent the suicide of a pre-trial detainee, a plaintiff must prove deliberate indifference; and that deliberate indifference constitutes the purposeful punishment necessary for finding a fourteenth amendment violation. We specifically rejected the contention that such an action could be maintained on a theory of mere negligence. The conduct for which liability attached must be more than negligence, it must demonstrate deliberateness tantamount to an intent to punish.

*Id*. at *4, (quoting *Molton v. City of Cleveland* 839 F.2d 240 (6th Cir. 1988)). In the instant case, there is no such "deliberateness tantamount to an intent to punish." As pointed out above, the facts in *Nance* were much more favorable to the plaintiffs because Nance acted in a bizarre manner, stripping off his clothes, banging on cars, swinging his arms about wildly, and not responding to those around him and the mental health coordinator observed that Nance was delusional and paranoid. By contrast, Lambert appeared to be intoxicated or under the influence of a drug and acted tired as opposed to delusional and paranoid. Notwithstanding Nance's behavior and the observation of "delusional and

10

paranoid," the Sixth Circuit found no liability because the requisite deliberate indifference was lacking. In the instant case, the requisite deliberate indifference is also lacking, especially in light of the fact that the Decedent did not exhibit any strange behavior and rejected the notion that he was suicidal.

In *Ellis v. Washington County and Johnson City, Tennessee*, 198 F.3d 225 (6th Cir. 1999), a mother and the minor child of a pretrial detainee, Craig Lanthorn, brought a wrongful death action, under Section 1983, against the city, county, and jailors after Lanthorn committed suicide in the county jail. Prior to his arrest, Lanthorn had acted delirious or delusional but it was believed he was under the influence of drugs. The arresting officer thought Lanthorn was drunk. One jailor, who had known Lanthorn since high school, was somewhat suspicious of his behavior and noticed Lanthorn crying while speaking on the telephone to his mother. This jailor questioned Lanthorn about suicide but he denied any suicidal ideation. Otherwise, Lanthorn exhibited no other suicidal conduct during his stay in jail. Lanthorn's mother, a clinical psychologist, stated that Lanthorn was not suicidal the morning before his death. The Sixth Circuit held that there was no evidence from which a reasonable jailor would have foreseen suicide and no deliberately indifferent policy was a proximate cause of Lanthorn's death. The Court further stated that the county was under no obligation to isolate Lanthorn in a suicide cell or take other extraordinary steps in anticipation of suicide.

In the case, *sub judice*, the Plaintiffs have sued Bonnie Robinson, Jeremy Wheeler and Eric Jernigan. None of these individuals even had any dealings with the Decedent until after he had actually hanged himself. It is difficult to imagine a circumstance under which they could possibly have had the requisite objective, let alone subjective, culpability

11

necessary to establish deliberate indifference. Likewise, in this case, Plaintiff cannot show that a reasonable jailor would have foreseen that Lambert was suicidal. For these reasons, the claims against these individual defendants must fail as a matter of law.

IV.     ROBERT LAMBERT, SR. HAS NO INDEPENDENT CLAIMS.

Although it is not clear from the complaint, it appears that the Decedent's father iS asserting claims under section 1983 in his individual capacity as opposed to solely as a representative of the estate of his late son. (See Introductory Paragraph to Complaint). To allow him to proceed under the Civil Rights Act in his individual capacity is contrary to established Sixth Circuit case law, and has been rejected by numerous courts considering such an argument. Simply put, he does not have first party standing to raise his son's rights in his individual capacity.

An essential element of first party standing is that the plaintiff demonstrate that the alleged governmental action resulted in the abridgment of his own constitutional rights. *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S. Ct. 2868, 49 L.Ed.2d 826 (1976). Lambert, Sr., individually, is not claiming violation of his own constitutional rights, but that he presumably has damages as a result of the alleged violation of his son's rights. He therefore does not have first party standing to bring this cause of action.

The Sixth Circuit has indicated that an action for deprivation of civil rights is an action that is personal to the injured party. In *Jaco v. Bloechle*, 739 F.2d 239 (6th Cir. 1984), the Sixth Circuit considered the issue of whether the administratrix of a decedent's estate could maintain a cause of action pursuant to § 1983 for the alleged unconstitutional conduct leading to her son's death. *Id.* at 242. The *Jaco* court concluded she could not based upon the explicit language of the statute. *Id.* Specifically, the court reasoned that section 1983,

12

by virtue of its explicit language, is a personal action cognizable only by the party whose civil rights have been violated. *Id. Accord, Pierzynowski v. Police Dept. of City of Detroit*, 941 F. Supp. 633, 640 (E.D. Mich. 1996) (family members may not maintain action for allegedly unconstitutional arrest of a family member); *Broadnax v. Webb*, 892 F. Supp. 188 (E.D. Mich. 1995) (limiting section 1983 claims only to those who actually suffered the constitutional deprivation).

The Tenth Circuit has also held that a federal civil rights claims must be based upon the violation of the plaintiff's personal rights, and not the rights of someone else. *Archuleta v. McShan*, 897 F.2d 495 (10th Cir. 1990). In *McShan*, a minor child brought a federal cause of action against a police officer and his superiors for the alleged wrongful arrest of his father. *Id.* at 496. The Plaintiff was a bystander who witnessed an altercation between his parents and the police officer as a result of the arrest. *Id.* The court declined to extend constitutional protection, pointing out it is a well-settled principle that a section 1983 claim must be predicated on a violation of the plaintiff's personal rights, and not the rights of someone else. *Id.* at 497. *Accord, Dohaish v. Tooley*, 670 F.2d 934, 936 (10th Cir. 1982), *cert. denied*, 459 U.S. 826 (1983); *Trujillo v. Board of Commissioners*, 768 F.2d 1186, 1187 (10th Cir. 1985). *Coon v. Ledbetter*, 780 F.2d 1158, 1160-61 (5th Cir. 1986);

## V.  GOVERNMENTAL TORT LIABILITY ACT THEORY–SUPPLEMENTAL JURISDICTION.

A federal district court may, in its discretion, decline supplemental jurisdiction over a state law claim, even if jurisdiction would otherwise be proper under 28 U.S.C. § 1367(a). Section 1367(c)(4) allows a district court to "decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (4) in exceptional circumstances, there are other

13

compelling reasons for declining jurisdiction." This District has been generally consistent in declining to extend jurisdiction. See *Fromuth v. Metropolitan Gov't of Nashville*, 158 F.Supp.2d 787, 798 (M.D.Tenn.2001) (dismissing GTLA claims while allowing remaining civil rights claims against individual officers to proceed to trial).

In *Gregory v. Shelby County, Tenn.*, 220 F.3d 433 (6th Cir.2000), the Court of Appeals affirmed the district court's dismissal of the TGTLA claims, stating, "[i]n this instance, the Tennessee legislature expressed a clear preference that TGTLA claims be handled by its own state courts. This unequivocal preference of the Tennessee legislature is an exceptional circumstance for declining jurisdiction." Id. at 446. See also *Maxwell v. Conn*, No. 89-5060, 1990 WL 2774 (6th Cir. Jan.18, 1990) (TGTLA's grant of exclusive jurisdiction to the state courts "belied" plaintiff's argument that he could expect to try the TGTLA claims in the same proceeding as his federal claims); *Spurlock v. Whitley*, 971 F.Supp. 1166, 1185 (M.D.Tenn.1997).

Furthermore, in *Beddingfield v. City of Pulaski*, 666 F.Supp. 1064 (M.D.Tenn.1987), *rev'd on other grounds*, 861 F.2d 968 (6th Cir.1988), the court held that the TGTLA's exclusive grant of jurisdiction to the state circuit courts precluded the federal court's exercise of supplemental jurisdiction over TGTLA claims. The court reasoned that when such supplemental state law claims involve neither federal law nor federal diversity jurisdiction, no Supremacy Clause interests are implicated. Therefore, federal courts would appear obligated to apply the TGTLA limitations on suability as a matter of state substantive law. See, *Fromuth, supra*.

For these reasons, the reasons the Court should generally decline to exercise

14

supplemental jurisdiction over the claims under the TGTLA.[2]

VI. HUMPHREYS COUNTY IS ENTITLED TO SUMMARY JUDGMENT FOR THE NEGLIGENCE BASED THE GOVERNMENTAL TORT LIABILITY ACT CLAIM.

To the extent, that the Court, in an attempt to preserve judicial economy retains supplemental jurisdiction over the state law claims under the GTLA the Plaintiff's claim of negligence must fail. The plaintiff's GTLA theory is in reality one for wrongful death of the decedent--one of negligence. That is, the alleged negligence of the County's employee in failing to prevent the suicide. Implicit in this is the failure to remove Lambert's belt. There is no dispute that the injury was caused by the actual act of the Decedent. Although the Tennessee Supreme Court has adopted comparative fault, the doctrine of independent intervening cause still remains alive as a viable defense as does express assumption of the risk.

A claim of negligence requires proof of each of the following elements: a duty of care owed by the defendant to the plaintiff; conduct falling below the applicable standard of care that amounts to a breach of that duty; an injury or loss; cause in fact; and proximate cause. McClung v. Delta Square Ltd. Partnership, 937 S.W.2d 891, 894 (Tenn. 1996); McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995). The focus in this case is on the duty element and the last two elements. The Tennessee Supreme discussed the nature of proximate causation by contrasting it with causation in fact:

---

[2]     Counsel is aware of at least one case in which Magistrate Judge Brown opined that it would be appropriate to exercise jurisdiction where dismissal would effectively result in one of dismissal with prejudice because of the refusal of the Tennessee Supreme Court in *Lynn v. City of Jackson* 63 S.W.3d 332 (Tenn. 2001) to recognize tolling of the statute of limitations for a GTLA under section 1367. See, *Stockton et al. vs. Rutherford County*, et al. No. 3:01-0615 , Memorandum Opinion and Order Granting in Part and Denying in Motion to Remand (1-31-2002)(docket entries 19 and 20). However, since the Plaintiff in this case has filed the identical action in state court no such dismissal would be on the merits.

15

The distinction between cause in fact and proximate, or legal, cause is not merely an exercise in semantics. The terms are not interchangeable. Although both cause in fact and proximate, or legal, cause are elements of negligence that the plaintiff must prove, they are very different concepts. Cause in fact refers to the cause and effect relationship between the defendant's tortious conduct and the plaintiff's injury or loss. Thus, cause in fact deals with the "but for" consequences of an act. The defendant's conduct is a cause of the event if the event would not have occurred but for the conduct. In contrast, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established. Proximate or legal cause is a policy decision made by the legislature or the courts to deny liability for otherwise actionable conduct based on considerations of logic, common sense, policy, precedent and 'our more or less inadequately expressed ideas of what justice demands or of what is administratively possible and convenient.' (Citations omitted).

Snyder v. LTG Lufttechnische GMbH, 955 S.W.2d 252, 256 n. 6 (Tenn. 1997). See also Kilpatrick v. Bryant, 868 S.W.2d 594, 598 (Tenn. 1993). An independent intervening cause breaks the chain of proximate causation and thereby precludes recovery. The law is equally clear, however, that "an intervening act, which is a normal response created by negligence, is not a superseding, intervening cause so as to relieve the original wrongdoer of liability, **provided the intervening act could have reasonably been foreseen** and the conduct [of the original wrongdoer] was a substantial factor in bringing about the harm." McClenahan v. Cooley, 806 S.W.2d 767, 775 (Tenn. 1991)(emphasis supplied); see also, McClung, 937 S.W.2d at 905; Haynes v. Hamilton County, 883 S.W.2d 606, 612 (Tenn. 1994). Accordingly, "an intervening act will not exculpate the original wrongdoer unless it is shown that the intervening act could not have been reasonably anticipated." McClenahan, 806 S.W.2d at 775. Whether such an act or event constitutes an intervening cause is for the jury to determine unless the uncontroverted facts and inferences to be drawn from the facts make

16

it so clear that all reasonable persons must agree on the proper outcome. <u>McClung</u>, 937 S.W.2d at 905.

Tennessee courts have held that suicide may constitute an intervening cause if it is a willful, calculated, and deliberate act of one who has the power of choice. See, e.g., <u>Lancaster v. Montesi</u>, 216 Tenn. 50, 390 S.W.2d 217, 221-22 (Tenn. 1965); <u>Jones v. Stewart</u>, 183 Tenn. 176, 191 S.W.2d 439, 440 (Tenn. 1946); <u>Weathers v. Pilkinton</u>, 754 S.W.2d 75, 78-79 (Tenn. App. 1988); <u>Eckerd's, Inc. v. McGhee</u>, 19 Tenn. App. 277, 86 S.W.2d 570, 575 (Tenn. App. 1935). As noted by the Plaintiff in his complaint the Decedent hanged himself with a thick leather belt by weaving that same through grating in the cell. Facts at ¶ 19. The act of weaving the belt through the grating is a voluntary act that would have taken determination on the part of the Decedent. Facts at ¶ 20.

In the case of <u>Long v. Brookside Manor</u>, 885 S.W.2d 70 (Tenn. App. 1994), Brookside was sued when its employee assaulted the plaintiff. Brookside did not perform an adequate background check and did not comply with some state requirements regarding background checks for nursing home employees. Indeed, had Brookside conducted a background check, while they may not have hired the worker, there was no evidence to suggest that any history of violence would have been discovered. In dismissing the case following a substantial jury verdict in favor of the plaintiff, the Court of Appeals stated:

> Assuming that Brookside's failure to follow Rule 1200-8-6-.04(2)(b) is negligence per se, it does not follow that liability attaches unless it is shown that there is a causal connection between Brookside's negligence in violating the rule and the injuries of plaintiff and that Brookside's negligence was the proximate cause of plaintiff's injuries. *Steagall v. Dot Manuf. Corp.*, 223 Tenn. 428, 446 S.W.2d 515, 518 (1969). Liability cannot be predicated upon mere violations of a statute, ordinance, or regulation unless it affirmatively appears that such violation was the proximate cause of the injury. *Biggert v.*

17

*Memphis Power and Light Co., 168 Tenn. 638, 80 S.W.2d 90, 92 (Tenn. 1935).*

Here there has been no showing that Brookside's violation of the regulation was the proximate cause of plaintiff's injury. Furthermore, there has been no showing that Keeble Bradley showed any aggression while working at Brookside or at any former employment. There has also been no showing of a propensity on the part of Bradley to commit violence.

"Once a duty to plaintiff is established, and negligence of the defendant is established, the ultimate question is whether the negligence of defendant was the proximate or legal cause" of plaintiff's injuries. *Lancaster v. Montesi*, 216 Tenn. 50, 56, 390 S.W.2d 217, 220 (Tenn. 1965). To warrant recovery in an action for personal injuries sustained through the alleged negligence of a defendant, the plaintiff must show not only that the defendant was guilty of negligence, but that such negligence was the proximate cause of the alleged injuries. See *Garrett v. McConkey,* 62 Tenn. App. 591, 466 S.W.2d 498, 500 (Tenn.App. 1970*)* (citing, *Lancaster v. Montesi*, 216 Tenn. 50, 390 S.W.2d 217 (Tenn. 1965)).

885 S.W.2d at 73-74.

Likewise, Plaintiffs cannot prevail because they cannot overcome the requirements of Tenn. Code Ann., Section 29-20-310, which provides that:

(a) The court, before holding a governmental entity liable for damages, must first determine that the employee's or employees' act or acts were negligent and the proximate cause of plaintiff's injury, that the employee or employees acted within the scope of their employment and that none of the exceptions listed in § 29-20-205 are applicable to the facts before the court.

A prison officials' duty to exercise ordinary and reasonable care for the protection of inmates does not generally extend to protecting prisoners from self-inflicted injury or death. **Cockrum v. State**, 843 S.W. 2d. 433 (Tenn. Ct. App. 1992). Only where the prison official knows or had reason to know that the prisoner might harm himself or herself will

18

the official or agency be found to be negligent and, therefore, held liable. *Id*.

In Inman v. Wilson, 1988 WL 9798 (Tenn. App. 1988)(attached as exhibit C), parents sued to recover damages for the death of their daughter after she committed suicide while in jail. The parents alleged that the city and its officers breached their duty to exercise reasonable care for the safety of their daughter. When their daughter was first taken to jail she was asked whether she had a belt, to which she replied "no, but I wish I did." The parents insisted that this statement by their daughter placed the jailors on notice of her potential suicide. There were no other indications that she was suicidal. Both parents testified that their daughter never showed any intention to commit suicide and she had no prior history of suicide. Based on these facts, the court dismissed the case holding that, even with this statement, the jailors could not have reasonably foreseen that Ms. Inman would commit suicide. The Court stated that Ms. Inman's intentional act was an efficient, intervening and unforeseeable cause which barred recovery. *Id.* at p. 2.

Clearly, in the case at bar, Defendant's employees' acts even if negligent, were not the proximate cause of Lambert's death. The employees had no reason to believe that Lambert would commit suicide. His condition was one of a person who appeared to be intoxicated or high, not suicidal. He specifically denied any suicidal tendencies. Indeed, had they had such information he would have been scheduled to see the mental health professional who was in the jail the morning of the day he committed suicide. There is simply no evidence or even an inference that could be reasonably drawn that employees of the Humphreys County Sheriff's Department knew or should have known that Lambert would attempt suicide.

19

## CONCLUSION

For the reasons set forth above, the Plaintiff cannot prevail because they cannot show that a policy or custom of Defendant caused Lambert's suicide. Plaintiff cannot show that the Official Defendant or its employees exhibited deliberate indifference.

Finally, Plaintiff cannot prove that the acts of the Humphreys County Sheriff's Department employees in failing to remove Lambert's belt was the proximate cause or legal cause of his death when compared with the intervening act of Lambert himself in committing suicide. For these reasons, summary judgment in favor of Defendants should be granted.

Respectfully submitted,

  /s/ **John D. Schwalb**
**JOHN D. SCHWALB (011671)**
john_schwalb@msn.com
**WILLIAMS & SCHWALB, PLLC**
The Lotz House
1111 Columbia Avenue
Franklin, Tennessee 37064
(615) 794-7100
(615) 794-6333 facsimile
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing has been served in accordance with the local rules of court and guidelines governing electronic case filing and the Federal Rules of Civil Procedure upon:

David B. Lyons, Esq.
Attorney for Plaintiff
1308 Eighth Avenue North
Nashville, Tennessee 37208
lyonslaw@comcast.net

this 23rd day of October 2006.

  /s/ **John D. Schwalb**
**JOHN D. SCHWALB**

20

**EXHIBIT A**
**TO MEMORANDUM IN SUPPORT OF**
**SUMMARY JUDGMENT**



148 Fed.Appx. 499                                                                                          Page 1
148 Fed.Appx. 499, 2005 WL 2173780 (C.A.6 (Mich.)), 2005 Fed.App. 0785N
**(Cite as: 148 Fed.Appx. 499)**

**H**
[Briefs and Other Related Documents](#)
Bradley v. City of FerndaleC.A.6 (Mich.),2005.2005
FED. App. 0785NThis case was not selected for
publication in the Federal Reporter.NOT
RECOMMENDED FOR FULL--TEXT
PUBLICATIONSixth Circuit Rule 28(g) limits citation
to specific situations. Please see Rule 28(g) before
citing in a proceeding in a court in the Sixth Circuit. If
cited, a copy must be served on other parties and the
Court.Please use FIND to look at the applicable circuit
court rule before citing this opinion. Sixth Circuit Rule
28(g). (FIND CTA6 Rule 28.)
     United States Court of Appeals,Sixth Circuit.
Stephanie BRADLEY, Personal Representative of the
          Estate of Clark Bradley, Deceased,
               Plaintiff-Appellee,
                     v.
            CITY OF FERNDALE, et al.,
             Defendants-Appellants.
             **Nos. 04-1465, 04-1474.**

                 Sept. 8, 2005.

**Background:** Personal representative of deceased
pretrial detainee's estate brought cause of action to
recover from city and city police officers, under civil
rights statute and on gross negligence claims, for
detainee's death by hanging in cell. The United States
District Court for the Eastern District of Michigan
denied individual officers' motion for summary
judgment, and officers appealed.

**Holdings:** The Court of Appeals, Williams, Senior
District Judge for the Western District of Virginia,
sitting by designation, held that:

(1) Court of Appeals had jurisdiction to hear appeal
from district court's denial of civil rights defendants'
motion for summary judgment on **qualified immunity**
grounds, even though district court based its holding on
existence of genuine issues of material fact;

(2) police officer who gave pretrial detainee blankets in
his cell, despite being aware of detainee's remark during
booking that he might as well shoot himself, was not
deliberately indifferent to fact that his actions might
increase risk of detainee's **suicide**;

(3) police dispatcher, in waiting 36 minutes after his
last check to look in on detainee, was not deliberately
indifferent to fact that his actions might increase risk of
detainee's **suicide**;

(4) police lieutenant was not deliberately indifferent;
and

(5) officers were entitled to governmental immunity on
state law gross negligence claims.

Reversed.

Keith, Circuit Judge, concurred in part and dissented in
part and filed opinion.
West Headnotes
[1] **Federal Courts 170B** 🔑      **557**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)1 In General
                170Bk554 Nature, Scope and Effect of
Decision
                    170Bk557 k. Dismissal, Nonsuit,
Direction of Verdict or Summary Judgment. Most Cited
Cases
Court of Appeals had jurisdiction to hear appeal from
district court's denial of civil rights defendants' motion
for summary judgment on **qualified immunity** grounds,
even though district court based its holding on existence
of genuine issues of material fact; while Court of
Appeals could not review district court's determination
regarding existence of genuine issues of material fact,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

it could consider whether, even viewing facts in light most favorable to plaintiff, they failed to establish a prima facie violation of clear constitutional law.

**[2] Civil Rights 78 🔗        1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity;  Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Any violation by municipal police officers of police department's own internal procedures regarding treatment of detainees exhibiting suicidal tendencies, in not removing blankets from detainee's cell and in not conducting cell-checks at 15 minute intervals, was insufficient, without more, to establish that officers had acted with **deliberate indifference** to fact that this conduct would increase risk of detainee's **suicide**; even if internal police department procedures were violated, court, in deciding whether officers were entitled to **qualified immunity** from liability under § 1983, had to determine whether officers subjectively perceived facts from which they could draw inference that their individual actions would increase risk of detainee's **suicide** and whether they acted in conscious disregard of that risk. 42 U.S.C.A. § 1983.

**[3] Evidence 157 🔗        506**

157 Evidence
    157XII Opinion Evidence
        157XII(B) Subjects of Expert Testimony
            157k506 k. Matters Directly in Issue. Most Cited Cases
While expert could testify, in civil rights action arising out of pretrial detainee's death by **suicide** in cell, as to whether police officers' actions complied with police department's internal procedures, he could not testify that violations of these policies proved that officers acted with **deliberate indifference** to detainee's suicidal tendencies. 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 🔗        1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity;  Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Police officer who gave pretrial detainee blankets in his cell, despite being aware of detainee's remark during booking that he might as well shoot himself, was not deliberately indifferent to fact that his actions might increase risk of detainee's **suicide**, and was entitled to **qualified immunity** in civil rights action arising out of detainee's **suicide** in cell, where officer had received no training on how to deal with suicidal prisoners, and there was no evidence that he was aware that detainee might attempt to hang himself with blanket. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 🔗        1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity;  Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Police dispatcher who was responsible both for monitoring radio and telephones and for checking on detainees, in waiting 36 minutes after his last check to look in on pretrial detainee who had remarked during booking that he might as well shoot himself, and who had been labeled a **suicide** risk, was not deliberately indifferent to fact that his actions might increase risk of detainee's **suicide** and was entitled to **qualified immunity** in civil rights action arising out of detainee's death when he hanged himself with blanket in cell; while police department's internal procedures provided that checks at 15-minute intervals could be ordered for detainees who were **suicide** risks, decision to order such 15-minute checks was for police lieutenant, and not for dispatcher, to make, and there was no evidence suggesting that dispatcher believed that detainee might commit **suicide** if not checked on earlier. 42 U.S.C.A. § 1983.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[6] Civil Rights 78**  ☞     1376(6)

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity;  Good Faith and Probable Cause
           78k1376 Government Agencies and Officers
              78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Police intern who had no responsibility for checking on detainees except when ordered to do so, and who had been directed to perform other work on evening that detainee hanged himself in cell, could not have acted in conscious disregard of detainee's suicidal tendencies in failing to conduct 15-minute checks on his cell and was entitled to **qualified immunity** in subsequent civil rights action. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78**  ☞     1376(6)

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity;  Good Faith and Probable Cause
           78k1376 Government Agencies and Officers
              78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Police lieutenant who had discretion, pursuant to police department's internal procedures, both to direct that blankets be removed from cell of any detainee exhibiting suicidal tendencies and to order 15-minute checks of any such detainee's cell was not deliberately indifferent to fact that his failure to order such precautions for detainee who had remarked during booking that he might as well shoot himself would increase risk of detainee's **suicide**, and was entitled to **qualified immunity** in civil rights action arising from detainee's death when he hanged himself with blanket in cell, where lieutenant had made provision to have detainee transferred to facility which was better equipped to provide for his needs, and where lieutenant, upon learning that detainee was lying unconscious in cell, had entered cell and attempted mouth-to-mouth resuscitation, despite knowing that detainee had Hepatitis C. 42 U.S.C.A. § 1983.

**[8] Federal Courts 170B**  ☞     557

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
           170BVIII(C)1 In General
              170Bk554 Nature, Scope and Effect of Decision
                  170Bk557 k. Dismissal, Nonsuit, Direction of Verdict or Summary Judgment. Most Cited Cases
Court of Appeals had jurisdiction to hear appeal from district court's denial of individual police officers' motion for summary judgment, upon governmental immunity grounds, from liability for their alleged gross negligence in not taking appropriate steps to prevent pretrial detainee's death by **suicide** in cell.

**[9] Municipal Corporations 268**  ☞     747(3)

268 Municipal Corporations
    268XII Torts
        268XII(B) Acts or Omissions of Officers or Agents
           268k747 Particular Officers and Official Acts
              268k747(3) k. Police and Fire. Most Cited Cases
Actions of individual police officers in allowing pretrial detainee who had been labeled a **suicide** risk to have blankets in his cell, and in not conducting cell checks at 15-minute intervals, were not most immediate, efficient, and direct cause of detainee's death by hanging in cell, so that officers were entitled to governmental immunity on gross negligence claims asserted against them under Michigan law, where officers had received no training from city on how to deal with suicidal prisoners.

**\*502** On Appeal from the United States District Court for the Eastern District of Michigan.

Geoffrey N. Fieger, Victor S. Valenti, Fieger, Fieger, Kenney & Johnson, Southfield, MI, for Plaintiff-Appellee.

T. Joseph Seward, Karen M. Haapala, Cummings, McClorey, Davis & Acho, Livonia, MI, for Defendant-Appellant.

Marcia L. Howe, Johnson Rosati LaBarge Aseltyne & Field, PC, Farmington Hills, MI, for Defendant Thomas

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

J. Thomson.

Before DAUGHTREY and KEITH, Circuit Judges and WILLIAMS, Senior District Judge.FN*

> FN* The Hon. Glen M. Williams, Senior United States District Judge for the Western District of Virginia, sitting by designation.

KEITH, Circuit Judge, concurring in part, dissenting in part.WILLIAMS, Senior District Judge.

**1 Defendants-Appellants, City of Ferndale, Chief Kitchen, Officer Paul Simpson, Dispatcher Jason White, Cadet Wesley Crouse and Lieutenant Thomas J. Thomson appeal the district court's denial of their motions for summary judgment as to the plaintiff-appellee's federal and state claims. The district court held that summary judgment was inappropriate because the plaintiff had submitted sufficient evidence to create a genuine issue of material fact as to whether the defendants were deliberately indifferent to the decedent's serious medical needs. The district court further held that the plaintiff had submitted sufficient evidence to create a genuine issue of fact as to whether the defendants' actions were the proximate cause of Bradley's death. For the reasons set forth below, we REVERSE the decision of the district court denying the defendants' motions for summary judgment.

I. Background

On the night of January 22, 2000, the Ferndale Police Department was involved in a barricaded gunman situation at a Ferndale residence. (Joint Appendix, ("J.A.") at 336.) Due to the serious nature of the event, all available officers were committed to the scene. (J.A. at 336.) As a result of this commitment, Officer Paul Simpson, ("Simpson"), was the only officer available to patrol the city.FN1 (J.A. at 336.) At approximately 7:53 p.m., Simpson responded to a suspicious persons report at 2047 Symes Street. (J.A. at 49.) As Simpson approached that address, he observed the decedent, Clark Bradley, ("Bradley"), wandering along the street with an open container of

alcohol. (J.A. at 50.) Simpson pulled up along side of Bradley and began questioning him in order to determine whether he was the individual specified in the suspicious persons report. (J.A. at 49-50.) Simpson relayed Bradley's information to Dispatcher Jason White, ("White"), who entered it into the Law Enforcement Information Network Database. (J.A. at 50.) Upon entering his information into the system, the officers learned that Bradley was wanted on an outstanding bench warrant issued February 26, 1999, by the Oakland County Circuit Court. (J.A. at 50, 117.) Because the warrant was a "no-bond" warrant, Lieutenant Thomas J. Thomson, ("Thomson"), the officer in charge at the Ferndale Police Department, ordered Simpson to arrest Bradley and transport him to the station *503 pending his transfer to the Oakland County Jail. (J.A. at 315-16.)

> FN1. On the night in question, Simpson was not scheduled to report for duty until 11:00 p.m. Due to a shortage in manpower, however, Simpson reported for duty five hours early at 6:00 p.m. (J.A. at 49.)

As Bradley was being processed at the Ferndale Police Station, he remarked to Simpson that Simpson should give him his gun so that he could shoot himself.FN2 (J.A. at 51.) Although Simpson believed that Bradley had made the remark in jest, he reported it to Thomson, who had himself heard the remark. (J.A. at 51, 57, 334.) Thomson then asked Bradley if there was a problem, and Bradley responded sarcastically. (J.A. at 58.) White noted that Bradley smelled of alcohol and had trouble staying awake. (J.A. at 66.) During the booking process, the officers also learned that Bradley suffered from Hepatitis C. (J.A. at 57.) Based upon his medical condition and his remark to Simpson, Bradley's jail card was marked with a red sticker indicating the need to apply universal and **suicide** precautions during Bradley's detention. (J.A. at 52.)

> FN2. Although the exact wording of Bradley's statement is not known, the parties generally agree that the statement involved Bradley either shooting himself or being shot by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Simpson.  (J.A. at 51, 57.)

**\*\*2** At 8:35 p.m., Thompson notified the Oakland County Sheriff's Department that Bradley's pickup and transfer to the Oakland County Jail should be completed that night and could not be postponed until after the weekend as the County had requested.  (J.A. at 123.)  The request itself stated:

Would normally not have a problem holding until Monday, but htis (sic) prisoner is intoxicated, has Hepatitis C, and is suicidal, and we are in the middle of a barricaded gunman.  If possible, we would appreciate it if you would pick him up as soon as you can, as we are very short personnel due to the situation.  Please advise us what you are going to do.

(J.A. at 123.)  The County Sheriff's Department later responded that it would take possession of Bradley by midnight that night.  (J.A. at 120, 125.)

At 8:40 p.m., Bradley was placed in a biohazard cell at the Ferndale Police Station.  (J.A. at 118.)  Bradley was the only detainee in the jail at that time.  (J.A. at 118.)    Following standard booking procedures, Simpson removed Bradley's belt, money, wallet and jacket.  (J.A. at 203.)  Bradley was allowed to keep his shirt and pants and Simpson gave him two blankets.  (J.A. at 203, 210, 322.)  After placing Bradley in his cell, Simpson went back out on patrol, and White set a timer so that he would be reminded to check on Bradley in one hour.  (J.A. at 52, 227.)  After Simpson had left, White and Thomson returned to the dispatchers desk to continue monitoring the barricaded gunman situation.  (J.A. at 229.)

At some point after placing Bradley in his cell, Thomson looked at the monitors and saw Bradley lying on his bunk with the blankets.  (J.A. at 317-18.)    At 9:16 p.m., 36 minutes after Bradley was placed in his cell, White performed a cell check and found Bradley lying unconscious on the cell floor with a blanket tied around his neck.  (J.A. at 118, 229-30.)  White called to Thomson who entered the cell and began administering CPR.  (J.A. at 67.)    White instructed Crouse to call an ambulance and to notify Simpson that he was to return to the station immediately.  (J.A. at 231.)    Bradley was later pronounced dead from

self-asphyxiation.  (J.A. at 67.)

II. Procedural History

On July 19, 2002, Stephanie Bradley, ("plaintiff"), the personal representative of Bradley's estate, filed suit in the United States District Court for the Eastern District**\*504** of Michigan against the defendants in both their individual and official capacities.  (J.A. at 7.)  The plaintiff alleged that the defendants acted with **deliberate indifference** to Bradley's known suicidal tendencies in violation of the Fourteenth Amendment.  (J.A. at 13-16.)    The plaintiff further alleged that the defendants' actions constituted gross negligence which was the proximate cause of Bradley's injuries.  (J.A. at 11-12.)  On June 3, 2003, the City of Ferndale, Chief Kitchen, Simpson, White and Crouse filed a Motion for Summary Judgment, asserting theories of qualified, absolute and governmental immunity. (J.A. at 19.)  On June 5, 2003, Thomson, represented by separate counsel in this case, filed his own Motion for Summary Judgment based upon qualified and governmental immunity.  (J.A. at 92.)    On March 16, 2004, the district court granted the City of Ferndale's motion for summary judgment with regard to Bradley's state law gross negligence claims.  (J.A. at 403.)  The remaining defendants' motions for summary judgment were denied in their entirety.  (J.A. at 396-405.)    This appeal followed.

III. ANALYSIS

A. Plaintiff's § 1983 Claims

1. The Court's Jurisdiction

**\*\*3** [1] A district court's denial of **qualified immunity** is an appealable final decision under 28 U.S.C. § 1291, but only "to the extent that it turns on an issue of law."  *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).   "[A] defendant, entitled to invoke a **qualified immunity** defense, may not appeal a district court's summary judgment order insofar as that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones,* 515 U.S. 304, 319-20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). It is not fatal to the defendants' appeal that the district court based its holding on the existence of genuine issues of material fact, as "[t]his court has recognized the standard articulated by the Supreme Court: *'regardless of the district court's reasons* for denying **qualified immunity**, we may exercise jurisdiction over the ... appeal to the extent it raises questions of law.' " *Williams v. Mehra,* 186 F.3d 685, 689-90 (6th Cir.1999) (en banc) (quoting *Dickerson v. McClellan,* 101 F.3d 1151, 1157 (6th Cir.1996)). Therefore, despite the label used by the district court, this court can consider whether "the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a *prima facie* violation of clear constitutional law." *Berryman v. Rieger,* 150 F.3d 561, 563 (6th Cir.1998).

Because this court does not have appellate jurisdiction over factual issues, a defendant must "concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Berryman,* 150 F.3d at 563. In compliance with this rule, the brief submitted by Simpson, White, Crouse and Chief Kitchen specifically noted that it is their position on appeal that "the facts as alleged by the Plaintiff are insufficient to establish **deliberate indifference** on the part of the Defendants." (Final Reply Brief Of Defendants/Appellants Chief Kitchen, Officer Paul Simpson, Dispatcher Jason White, And Cadet Crouse, ("Ferndale Defendants' Reply Brief") at 2.) Thus, the court may hear the Ferndale defendants' appeal.

With regard to the plaintiff's claims against Thomson, the court notes that Thomson continues to argue on appeal that Bradley's actions were not sufficient to put a reasonable person on notice that he was possibly suicidal. (Defendant-Appellant Thomson's Brief On Appeal, ("Thomson's **\*505** Brief"), at 18.) The plaintiff argues that because Thomson failed to concede the facts as alleged by the plaintiff, this court is deprived of jurisdiction. (Plaintiff-Appellee's Final Consolidated Brief On Appeal, ("Appellee's Brief"), at 30.) This proposition is arguably supported by language in *Booher v. Northern Kentucky University*

*Board of Regents,* 163 F.3d 395, 396-97 (6th Cir.1999), and *Berryman v. Rieger,* 150 F.3d 561 (6th Cir.1998). If, however, aside from the impermissible arguments regarding disputes of fact, the defendant also raises "the 'purely legal' question of 'whether the facts alleged ... support a claim of violation of clearly established law,' " *Berryman,* 150 F.3d at 562 (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 528 n. 9, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)), then there is an issue over which this court has jurisdiction. Therefore, this court can ignore Thomson's attempts to dispute the facts and, nonetheless, resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction. *See Phelps v. Coy,* 286 F.3d 295, 298-99 (6th Cir.2002); *see also Beard v. Whitmore Lake Sch. Dist.,* 402 F.3d 598, 602 n. 5 (6th Cir.2005).

### 2. Individual Liability Under 42 U.S.C. § 1983

**\*4** To state a claim under 42 U.S.C. § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). A government official performing discretionary functions is entitled to **qualified immunity** in his individual capacity if his conduct does not violate constitutional standards in light of clearly established law at the time of the alleged violation. *Barber v. City of Salem, Ohio,* 953 F.2d 232, 236 (6th Cir.1992). "**Qualified immunity** is a government official's 'entitlement not to stand trial or face the other burdens of litigation.' " *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Such immunity is " 'an expression of policy designed to aid in the effective functioning of government.' " *Scheuer v. Rhodes,* 416 U.S. 232, 242, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (quoting *Barr v. Matteo,* 360 U.S. 564, 572-73, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959)). Implicit in the **qualified immunity** doctrine is a recognition that police officers, acting reasonably, may err. *Scheuer,* 416 U.S. at 242, 94 S.Ct. 1683.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In *Saucier,* the Supreme Court established a two-part test for determining whether **qualified immunity** applies. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. In the initial inquiry, the court must consider "this threshold question: [t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. If the facts, as alleged by the plaintiff, fail to establish a violation, then immunity applies. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. On the other hand, if the alleged facts sufficiently demonstrate a constitutional violation, we must determine "whether the right was clearly established." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. In making this determination, it is noted that the right claimed must be more than merely a generalized right; it must be clearly established in a particularized sense so that a reasonable official in the defendant's position knows that her actions violate that right. *Danese v. Asman,* 875 F.2d 1239, 1242 (6th Cir.1989). Thus, we begin by identifying the contours of the substantive right allegedly violated. **\*506***County of Sacramento v. Lewis,* 523 U.S. 833, 842 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

When prison officials act with **deliberate indifference** to the serious medical needs of prisoners so that they inflict unnecessary pain or suffering, their actions violate the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir.1994). Pretrial detainees enjoy analogous protection under the Fourteenth Amendment's Due Process Clause. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Horn,* 22 F.3d at 660.

Case law in this Circuit has established that psychological needs manifesting themselves in suicidal tendencies are serious medical needs for purposes of the due process analysis. *E.g., Horn,* 22 F.3d at 660; *Barber v. City of Salem, Ohio,* 953 F.2d 232, 239-40 (6th Cir.1992) (identifying the proper inquiry in **suicide** cases as "whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to **deliberate indifference** to the decedent's serious medical needs"); *Molton v. City of Cleveland,*

839 F.2d 240, 243 (6th Cir.1988). Nonetheless, there is no general right of pretrial detainees to be correctly screened for suicidal tendencies. *Danese,* 875 F.2d at 1244. Nor has this court recognized a generalized right of a prisoner to be protected against committing **suicide**. *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1096-97 (6th Cir.1992). Against this background, the district court correctly concluded that the right at issue here is the detainee's right to reasonable protection against taking his own life *if* that detainee has demonstrated a strong likelihood that he will commit **suicide**.

**\*\*5** To establish a violation of this right, the plaintiff must show that the decedent demonstrated a strong likelihood of taking his own life and that the defendants acted with **deliberate indifference** to that threat. *Barber v. City of Salem, Ohio,* 953 F.2d 232, 239-40 (6th Cir.1992). Because we construe the facts in the light most favorable to the nonmoving party for purposes of summary judgment, we assume, as the district court did, that a jury could reasonably find that Bradley's statements and behavior demonstrated a strong likelihood of **suicide**. At issue then is whether the plaintiff presented evidence from which a jury could reasonably find that defendants responded to this threat with **deliberate indifference**.

In *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the Supreme Court explained the **deliberate indifference** standard in the context of an Eighth Amendment claim. The term describes a state of mind more blameworthy than negligence and requires more than an ordinary lack of due care, but can be satisfied with less than acts or omissions with knowledge that harm will result. *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970. In *Farmer,* the Court adopted a subjective standard for determining whether an official acted or failed to act with **deliberate indifference**: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. This standard requires conscious disregard for a substantial risk of serious harm. *Farmer,* 511 U.S. at 839, 114 S.Ct. 1970; *Brooks v. Celeste,* 39 F.3d 125,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

128 (6th Cir.1994). Accordingly, when an official fails to act in the face of an obvious risk of which she should have known but did not, the official has not inflicted punishment in violation of the Eighth Amendment. *See Farmer,* 511 U.S. at 837-38, 114 S.Ct. 1970.

**\*507** Whether the defendants acted with **deliberate indifference** to the serious medical needs of Bradley presents a mixed question of law and fact, which this court reviews *de novo. Williams v. Mehra,* 186 F.3d 685, 690 (6th Cir.1999). Under the *Farmer* standard, in order for their conduct to constitute **deliberate indifference**, the defendants must have not only subjectively perceived the facts from which they could draw an inference that their individual actions would increase the risk of Bradley's **suicide**, they must also have consciously disregarded that risk.

### 3. Applying the Standard to the Individual Defendants

[2] As an initial matter, the court notes two points of contention with the district court's analysis. First, the district court based its denial of the defendants' motions for summary judgment almost entirely upon their alleged failure to follow Ferndale's internal procedures regarding the treatment of detainees exhibiting suicidal tendencies. (J.A. at 396-400.) For example, the district court notes that upon labeling Bradley as suicidal, the "[d]efendants did not encourage the prisoner to contact a friend or relative, they did not attempt to contact crisis intervention personnel; they did not remove the mattress, blanket, and other objects from the cell." (J.A. at 397.) The Supreme Court has held, however, that officials "do not lose their **qualified immunity** merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Officials become liable for damages only to the extent that there is "a clear violation of the statutory rights that give rise to the cause of action for damages." *Davis,* 468 U.S. at 194 n. 12, 104 S.Ct. 3012. In *Smith v. Freland,* 954 F.2d at 343, 347 (6th Cir.1992), this court held that under § 1983, "the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by

the local police force." *Smith,* 954 F.2d at 347; *See also Washington v. Starke,* 855 F.2d 346, 350 (6th Cir.1988) (holding that a defendant's entitlement to **qualified immunity** would not be precluded where the "violation of the intra-departmental regulation would not have given rise to a cause of action for damages under either federal or Michigan law" at the time of violation). In the case at hand, the plaintiff has not shown that the specific violations alleged to have been committed by the defendants-i.e. failing to provide for 15 minute checks on suicidal prisoners and failing to remove blankets from the cell of suicidal prisoners-are specifically prohibited by either federal or Michigan law. As noted above, whether or not a defendant acted with **deliberate indifference** is dependent upon their subjective state of mind. *Farmer,* 511 U.S. at 839, 114 S.Ct. 1970. Therefore, the district court erred when it based its denial of the defendant's motion for summary judgment solely upon the defendants' alleged failure to follow Ferndale's internal procedures. Instead, the court must ask whether the plaintiff has provided proof that the defendants subjectively perceived facts from which they could draw an inference that their individual actions would increase the risk of Bradley's **suicide**, and that they ultimately acted in consciously disregard of that risk. *See Farmer,* 511 U.S. at 837-39, 114 S.Ct. 1970.

**\*\*6** [3] Next, the court notes that the district court gave considerable weight to the plaintiff's expert's conclusory statements that the defendant's acted with **deliberate indifference** to Bradley's suicidal tendencies. For example, the district judge noted the expert's opinion that "[t]he egregious act alone of ignoring the policies because of a preoccupation with another is **\*508** an act of **deliberate indifference** to Bradley's medical needs." (J.A. at 398.) As noted above, the violation of city policy is not in and of itself a constitutional violation under 42 U.S.C. § 1983. *Smith,* 954 F.2d at 347. Furthermore, as this court noted in *Berry v. City of Detroit,* 25 F.3d 1342, 1353 (6th Cir.1994), " '**deliberate indifference**' is a legal term.... It is the responsibility of the court, not testifying witnesses, to define legal terms." *Berry,* 25 F.3d at 1353. Therefore, while the expert may give his opinion as to whether the defendant's actions complied with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ferndale's internal procedures, he may not testify that the violations of these policies proved that the defendants acted with **deliberate indifference** to Bradley's suicidal tendencies.[FN3] *See Berry,* 25 F.3d at 1353.

> FN3. *Berry* involved another case where the expert made conclusory statements regarding whether the defendants acted with **deliberate indifference**. *Berry v. City of Detroit,* 25 F.3d 1342 (6th Cir.1994). In *Berry,* the court noted that:
> "[A]n expert's opinion may 'embrace[ ] an ultimate issue to be decided by the trier of fact[,]' Fed.R.Evid. 704(a), the issue embraced must be a factual one. The expert can testify, if a proper foundation is laid, that the discipline in the Detroit Police Department was lax. He also could testify regarding what he believed to be the consequences of lax discipline. He may not testify, however, that the lax discipline policies of the Detroit Police Department indicated that the city was deliberately indifferent to the welfare of its citizens."
> *Berry,* 25 F.3d at 1353.

With the above concepts in mind, the court will assess the actions of each individual defendant in order to determine whether they subjectively perceived and disregarded a known risk that Bradley might harm himself.

### a. Officer Simpson

[4] Plaintiff contends that Simpson acted with **deliberate indifference** to Bradley's suicidal tendencies when he gave Bradley the blankets which Bradley later used to hang himself. (Appellee's Brief at 39.) The facts surrounding Simpson's involvement in this case reveal that upon hearing Bradley's statement about the gun, Simpson reported the remark to the shift commander in accordance with Ferndale's internal procedures. (J.A. at 51-52.) Although Simpson believed that Bradley had made the remark in jest, he

reported it anyway just to be safe. (J.A. at 51.) This led to Bradley being flagged a possible **suicide** risk. (J.A. at 52.) In accordance with procedure, Simpson removed Bradley's belt, jacket and other personal belongings before giving him two blankets and placing him in his cell. (J.A. at 203.) After placing Bradley in his cell, Simpson went back out on patrol. (J.A. at 52.)

The above facts do not evidence a conscious disregard for Bradley's safety. Upon hearing Bradley's statement, Simpson reported it to his shift commander in accordance with Ferndale's procedure. (J.A. at 51.) While it is true that Simpson gave Bradley the blankets, there is no evidence that he did so knowing that Bradley might attempt to hang himself. In fact, Simpson testified that prior to Bradley's death, he had received no training on how to deal with suicidal prisoners at all. (J.A. at 194.) Finally, the decision to remove the blankets was a decision to be made by the officer in charge, not Simpson. (J.A. at 287-88.) The option for removing blankets from the cells of detainees suspected of harboring suicidal tendencies is found under Section II(B)(4)(g) of Article 7 of Ferndale's Policies and Procedures. (J.A. at 288.) Section II(B)(4) of Article 7 provides that "the duty command officer *may* exercise one of the following alternatives" if his preliminary evaluation indicates a potential **suicide**. (J.A. at 287.) **\*509** At no point does the plaintiff argue that Thomson ordered Simpson to remove the blankets from Bradley's cell. Even if the court were to find that Simpson should have known of the risk presented when giving Bradley the blanket, when an official fails to act in the face of an obvious risk of which she should have known but did not, the official has not inflicted punishment in violation of the Eighth Amendment. *See Farmer,* 511 U.S. at 837-38, 114 S.Ct. 1970. Therefore, the district court erred when it denied Simpson's motion for summary judgment on **qualified immunity** grounds.

### b. Dispatcher White

**\*\*7** [5] Plaintiff contends that White exhibited **deliberate indifference** to Bradley's suicidal tendencies because he left Bradley unsupervised in his cell for 36 minutes while he was busy tending to the barricaded gunman situation. (Appellee's Brief at 39-40.) White's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

responsibilities as dispatcher required him to monitor the radio and phones and to make regular checks of the detainees held in the station's lockup. (J.A. at 221-22.) White testified that he spent 65 to 75 percent of his time monitoring the radio and phones. (J.A. at 222.) To support this role, six CCTV monitors were located above the dispatcher's desk which allowed the dispatcher to view the interior of each cell. (J.A. at 222.) White testified that he flagged Bradley as being a **suicide** risk upon hearing his remark. (J.A. at 66.) After Bradley was placed in his cell, White set a timer to remind himself to check on Bradley in one hour. (J.A. at 227.) Upon doing so, White returned to his desk and resumed monitoring the barricaded gunman situation. (J.A. at 229.) At 9:16, 36 minutes after Bradley was placed in his cell, White decided to check on Bradley, at which time he found Bradley lying unconscious on the floor with a blanket tied around his neck. (J.A. at 230.) White noted in his supplemental report that he went to check on Bradley before the hour was up because he was concerned with Bradley's peculiar behavior. (J.A. at 67.) Upon finding Bradley, White called to Thomson, who entered the cell and began to administer CPR. (J.A. at 66-67.)

Again, White's actions, as alleged by the plaintiff, do not support a finding that White acted with conscious disregard of Bradley's suicidal tendencies. The option of providing for 15 minute checks of detainees suspected of harboring suicidal tendencies is found under Section II(B)(4)(f) of Article 7 of Ferndale's Policies and Procedures. (J.A. at 288.) Sectionn II(B)(4) of Article 7 provides that "the duty command officer *may* exercise one of the following alternatives" if his preliminary evaluation indicates a potential **suicide**. (J.A. at 287.) Thus, the decision to check on prisoners every 15 minutes was left up to the duty command officer and not the dispatcher, and at no time does the plaintiff allege that White received such an order. Following standard procedure, White set a timer to remind himself to check on Bradley in one hour. (J.A. at 227.) Nonetheless, White decided to check on Bradley 24 minutes early because he was concerned with Bradley's peculiar behavior. (J.A. at 67.) White testified that he received no training regarding Ferndale's policies on interacting with suicidal prisoners. (J.A. at 234.) The plaintiff has provided no

evidence suggesting that White believed that Bradley might commit **suicide** if not checked on earlier. Therefore, the district court should have granted White's motion for summary judgment.

### c. Cadet Crouse

[6] The plaintiff next argues that Crouse acted with **deliberate indifference *510** to Bradley's suicidal tendencies because he failed to make 15 minute checks on Bradley as is provided for in Ferndale's Policies and Procedures. (Appellee's Brief at 39.) Here, the evidence shows that Crouse was hired as a police intern on October 15, 1999. (J.A. at 245-246.) Crouse testified that his duties as an intern required him to assist the dispatcher and desk officer in the dispatch center. (J.A. at 245.) Crouse testified that this usually entailed answering telephones, dispatching units to police calls and booking and checking on prisoners. (J.A. at 246.) Crouse noted that he also washed the police cars and picked up the prisoners' meals. (J.A. at 248.) Finally, Crouse noted that, as an intern, he was not to perform a job unless he was specifically instructed to do so. (J.A. at 246.)

**\*\*8** On the night of Bradley's **suicide**, Crouse had been instructed to try and contact the barricaded gunman by telephone.[FN4] (J.A. at 250-51.) Crouse noted that this was a continuing process as he would let the phone ring until the answering machine picked up, at which time he would hang up and call again. (J.A. at 250-51.) Crouse testified that he was not involved in booking Bradley and that he didn't remember anything from the time Bradley was booked until White checked his cell 36 minutes later. (J.A. at 250, 252.) As Crouse noted in his deposition, he was only responsible for checking on prisoners when he was specifically ordered to do so. (J.A. at 246.) At no point does the plaintiff suggest that Thomson ordered Crouse to cease his attempts to contact the barricaded gunman and check on Bradley.

Because the plaintiff has failed to produce any evidence suggesting that Crouse was responsible for checking on Bradley, it cannot be said that his failure to do so constituted a conscious disregard of Bradley's suicidal tendencies. Therefore, the court finds that the district court erred in failing to grant Crouse's motion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for summary judgment.

> FN4. Captain Collins's deposition further supports Crouse's testimony that he had been assigned to try and make contact with the barricaded gunman on the night of Bradley's **suicide**. (J.A. at 344.)

#### d. Lieutenant Thomson

[7] The plaintiff contends that Thomson acted with **deliberate indifference** to Bradley's suicidal tendencies because he did not see to it that Ferndale's policies were implemented. (Appellee's Brief at 42.) Specifically, the district court held that Thomson's failure to remove the blankets from Bradley's cell and establish 15 minute checks once he suspected that Bradley was suicidal created a genuine issue of material fact as to whether Thomson acted with **deliberate indifference**. (J.A. at 399-400.)

The record indicates that upon hearing Bradley's remark, Bradley was labeled as a **suicide** risk and Thomson made provisions to expedite Bradley's transfer to the County Jail. (J.A. at 57.) When the Oakland County Sheriff's Department requested that Bradley's transfer be postponed until the following Monday, Thomson responded that the transfer would have to be completed that night. (J.A. at 123.) The request itself stated:
Would normally not have a problem holding until Monday, but htis (sic) prisoner is intoxicated, has Hepatitis C, and is suicidal, and we are in the middle of a barricaded gunman. If possible, we would appreciate it if you would pick him up as soon as you can, as we are very short personnel due to the situation. Please advise us what you are going to do. (J.A. at 123.)

*511 At some point after placing Bradley in his cell, Thomson looked at the monitors and saw Bradley lying on his bunk with the blankets. (J.A. at 317-18.) Finally, after Thomson learned that Bradley had attempted **suicide**, he entered Bradley's cell and, despite knowing that Bradley had Hepatitis C, he began to administer CPR. (J.A. at 67.)

Again, Thomson's actions do not evidence a conscious disregard of Bradley's suicidal tendencies. Thomson recognized Bradley's condition and made provisions to have him transferred to a facility which was better equipped to provide for his needs. (J.A. at 57.) While removing the blankets and imposing 15 minute checks on Bradley's cell may have succeeded in preventing Bradley from committing **suicide**, Article 7 of Ferndale's Policies and Procedures does not specifically require these acts. (J.A. at 287-88.) Section II(B)(4) of Article 7 provides that "the duty command officer *may* exercise one of the following alternatives" if his preliminary evaluation indicates a potential **suicide**. (J.A. at 287-88.) As noted above, when an official fails to act in the face of an obvious risk of which she should have known but did not, the official has not inflicted punishment in violation of the Eighth Amendment. *See Farmer,* 511 U.S. at 837-38, 114 S.Ct. 1970. Therefore, the district court erred in denying Thomson's motion for summary judgment.

**9 Finally, because the plaintiff has not established that the above defendants violated Bradley's constitutional rights, there is no need to determine whether the right violated was clearly established.

#### e. Chief Kitchen

The district court denied Chief Kitchen's motion for summary judgment based on **qualified immunity** without prejudice because he had not been deposed at that time. (J.A. at 402.) The defendants have not opposed this ruling on appeal. Therefore, whether Chief Kitchen is entitled to **qualified immunity** is an issue best left for the district court.

#### B. Plaintiff's State Law Claims Alleging Gross Negligence

#### 1. The Court's Jurisdiction Over Defendants' Appeals

[8] In *Walton v. City of Southfield,* 995 F.2d 1331, 1342 -1344 (6th Cir.1993), this court held that a defendant could not appeal a district court's denial of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

governmental immunity pursuant to Michigan Compiled Laws § 691.1407 because it was not a "final decision" under 28 U.S.C. § 1291. Walton, 995 F.2d at 1344. In its ruling, the court noted that § 691.1407 provided governmental immunity from liability only, not from suit. Walton, 995 F.2d at 1344. In a diversity case or a federal question action involving pendent state claims, Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), and Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), dictate that the court must look to state immunity law to determine if a denial of immunity based on state law is appealable. Walton, 995 F.2d at 1343. In looking to Michigan law, the court noted that § 691.1407 codified the judicially created governmental immunity doctrine established in Ross v. Consumers Power Co., 420 Mich. 567, 363 N.W.2d 641 (1984). In Reardon v. Department of Mental Health, 430 Mich. 398, 424 N.W.2d 248, 254 (1988), the Michigan Court of Appeals noted that the statute "codified the Ross definition practically verbatim," except for abolishing Ross's ministerial versus discretionary test for individual immunity. In Marrical v. Detroit News, Inc., 805 F.2d 169, 172 (6th Cir.1986), this court noted that:

**512 Since we find no indication that Michigan's doctrine of absolute or **qualified immunity** includes a right to be free from the exigencies of trial, we conclude that Michigan law affords no basis for imposing on litigants the burdens of an interlocutory appeal.

The court's decision turned on the fact that the language in Ross referred to immunity from liability, and "nowhere included among its reasons for immunizing governmental officials the need to protect against the disruptions of pre-trial proceedings such as discovery or the burdens of trial other than the risk of ultimate liability in damages." Marrical, 805 F.2d at 173-74. Indeed, the text of § 691.1407 itself mentions immunity from liability only, not from suit.[FNS] Mich. Comp. Laws § 691.1407. As the defendants note, however, the June 4, 2002, amendment to Michigan Court Rule 7.202(7)(a)(v) included as a "final order," for purposes of appeal, "[a]n order denying governmental immunity to a governmental party, including a governmental agency, official, or employee." Therefore, as the denial of governmental immunity is now a "final order"

providing defendants with an appeal of right to the Michigan Court of Appeals, the issue is properly before the court on interlocutory appeal.

> FN5. Mich. Comp. Laws § 691.1407(2) states, in pertinent part:
> Each ... employee of a governmental agency ... shall be immune from tort liability for injuries to persons or damages to property caused by the ... employee ... while in the course of employment ... while acting on behalf of a governmental agency if all of the following are met:

2. The Individual Defendants' Entitlement to Governmental Immunity

**10 [9] The court will review a grant or denial of summary judgment de novo, using the same Rule 56(c) standard as the district court. Cox v. Kentucky Department of Transportation, 53 F.3d 146, 149 (6th Cir.1995) (citing Hansard v. Barrett, 980 F.2d 1059 (6th Cir.1992)). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, we view the factual evidence and draw all reasonable inferences in favor of the non-moving party. National Enterprises v. Smith, 114 F.3d 561, 563 (6th Cir.1997). To prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact. Klepper v. First Am. Bank, 916 F.2d 337, 341-42 (6th Cir.1990) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." Klepper, 916 F.2d at 341-42 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

The tort liability of governmental employees under Michigan law is governed by the employee provision of the governmental immunity act, which states in pertinent part:

Each ... employee of a governmental agency ... shall be immune from tort liability for injuries to persons or damages to property caused by the ... employee ... while in the course of employment**513** ... while acting on behalf of a governmental agency if all of the following are met:

(a) The ... employee ... is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The ... employee's ... conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

Mich. Comp. Laws § 691.1407(2). The district court held that "the proximate cause issue is for the jury to decide and Plaintiff has submitted sufficient evidence to create a genuine issue of fact as to whether their action or inaction was grossly negligent under the circumstances." (J.A. at 404.) There is no question that (a) and (b) are satisfied in the case at hand. The question is, therefore, whether the defendants' conduct amounted to gross negligence that was the proximate cause of Bradley's death.

**11** In *Robinson v. City of Detroit,* 462 Mich. 439, 613 N.W.2d 307, 317 (2000), the Michigan Supreme Court overruled *Dedes v. Asch,* 446 Mich. 99, 521 N.W.2d 488 (1994), "to the extent that it interpreted the phrase 'the proximate cause' in subdivision (c) to mean 'a proximate cause.' " The *Robinson* Court reasoned that "[t]he Legislature's use of the definite article 'the' clearly evinces an intent to focus on one cause." *Robinson,* 613 N.W.2d at 317. The court ultimately held that "[t]he phrase 'the proximate cause' is best understood as meaning the one most immediate, efficient, and direct cause preceding an injury."

*Robinson,* 613 N.W.2d at 317.

In *Kruger v. White Lake Twp.,* 250 Mich.App. 622, 648 N.W.2d 660 (2002), the Michigan Court of Appeals applied *Robinson* to a case involving the death of pretrial detainee. In *Kruger,* the decedent's mother called the White Lake Township Police Department and requested that her daughter, Katherine Kruger, ("Kruger"), be taken into custody. *Kruger,* 648 N.W.2d at 661. Kruger's mother informed the police that Kruger was intoxicated and that she feared that Kruger posed a danger to herself and others. *Kruger,* 648 N.W.2d at 661. Upon arresting Kruger, the officers learned that she had an outstanding warrant issued against her in the Bloomfield Township. *Kruger,* 648 N.W.2d at 661. After Kruger was arrested, the officers transported her to the White Lake Township Police Department to await her transfer to Bloomfield Township. *Kruger,* 648 N.W.2d at 661. Due to a lack of vacant holding cells, Kruger was handcuffed to a ballet bar in the station's booking room. *Kruger,* 648 N.W.2d at 661-62. The officers left Kruger in the booking room unattended, where she was later able to free herself from the handcuffs and escape. *Kruger,* 648 N.W.2d at 662. As she fled from the police station, Kruger ran into traffic and was struck and killed by an unidentified vehicle. *Kruger,* 648 N.W.2d at 662.

Kruger's representative subsequently filed suit alleging gross negligence on the part of the Township and its officers. *Kruger,* 648 N.W.2d at 662. The trial court dismissed Kruger's claim and Kruger appealed. *Kruger,* 648 N.W.2d at 661. Citing the court's holding in *Robinson,* the Michigan Court of Appeals held that, even assuming that the defendants' conduct was grossly negligent, it was not the direct cause of Kruger's death. *Kruger,* 648 N.W.2d at 663. The court noted that the more direct causes of Kruger's death was *514** her escaping from the police station, her running into traffic and her being hit by the car. *Kruger,* 648 N.W.2d at 663.

In an unpublished opinion by the Michigan Court of Appeals, *Scott v. Charter Twp. of Cinton,* No. 233266, 2002 WL 31160298 (Mich.App. Sept.27, 2002), the court applied the *Robinson* court's analysis to claims against police officials for failing to prevent an inmate's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

suicide. In *Scott,* the decedent hung himself with the drawstring of his pants after being arrested for a domestic dispute. *Scott,* 2002 WL 31160298, at *1. Following Scott's **suicide**, the plaintiff filed suit against the Township, its police department and several individual officers. *Scott,* 2002 WL 31160298, at *1. The district court granted summary judgment for the defendants and plaintiff appealed. *Scott,* 2002 WL 31160298, at *1. On appeal, the plaintiff argued that the trial court erred because it had set forth sufficient facts to show that the officers were grossly negligent for refusing to obtain medical treatment for Scott, for disobeying department policies on how to treat suicidal inmates and for failing to find and remove the drawstring on Scott's pants. *Scott,* 2002 WL 31160298, at *2-3. Applying the *Robinson* analysis, the court concluded that the one most immediate, efficient, and direct cause preceding his injury was Scott's act of hanging himself. *Scott,* 2002 WL 31160298, at *3.

**\*\*12** Next, in *Soles v. Ingham County,* 316 F.Supp.2d 536 (W.D.Mich.2004), the personal representative of the deceased inmate filed a complaint alleging that the inmate's **suicide** was caused by the prison officials' **deliberate indifference**, gross negligence and negligence. In *Soles,* the decedent, Frayer, was placed in an observation cell because he was known to be suicidal. *Soles,* 316 F.Supp.2d at 539. Frayer was later returned to the general population after promising a social worker that he would not harm himself. *Soles,* 316 F.Supp.2d at 540. On the evening of Frayer's **suicide**, one of the guards noticed that Frayer was acting strange and stated that he had a "gut hunch" that the Frayer might try to commit **suicide** at some point during the night. *Soles,* 316 F.Supp.2d at 540. The guard did not request that Frayer be returned to an observation cell, and he failed to inform his replacement of his suspicions. *Soles,* 316 F.Supp.2d at 540. Frayer successfully committed **suicide** later that night. *Soles,* 316 F.Supp.2d at 540. After his death, Frayer's personal representatives filed suit against the guard and social worker alleging that their actions constituted gross negligence. *Soles,* 316 F.Supp.2d at 540-41. In granting the defendants' motion for summary judgment, the district court concluded that even if the defendants were deemed responsible for

some nonfeasance amounting to gross negligence, liability could be imposed only if such nonfeasance was the proximate cause of Frayer's death. *Soles,* 316 F.Supp.2d at 546. The court went on to note that it was "undisputed that [Frayer] committed **suicide** while he was alone in his cell by hanging himself with a bed sheet." *Soles,* 316 F.Supp.2d at 546. The one most immediate, efficient and direct cause of his death was clearly not any nonfeasance by the defendants, but [Frayer's] own volitional self-destructive act. *Soles,* 316 F.Supp.2d at 546. When viewed in light of these decisions, it is clear that the one most immediate, efficient and direct cause of Bradley's death was his own act of hanging himself.

Finally, the plaintiffs expert placed the ultimate blame not with the individual officers, but with the City's failure to adequately train its employees. (J.A. at 173-74.) As noted above, the expert concluded that:

**\*515** Thomson indeed shoulders some blame for Bradley's death. But Thomson was not prepared to handle a **suicide** risk. That blame rests with the city and the police department. The provision of "hollow" policies without explanation or training to all of the members responsible for prisoners is the overriding reason and moving force behind the deficiencies that allowed Bradley, a known and flagged **suicide** risk, to complete the act while a TV monitor displayed his actions to otherwise engaged, indifference and untrained employees.

(J.A. at 173-74.) Therefore, as the actions of the individual defendants were not the one most immediate, efficient and direct cause of Bradley's death, the district court erred when it denied defendants Simpson, White, Crouse, Thomson and Chief Kitchen's motions for summary judgment on plaintiff's state law claims.

### IV. Conclusion

**\*\*13** For the reasons stated above, defendants Simpson, White, Crouse and Thomson are entitled to **qualified immunity**, and the district court's denial of these defendants' motions for summary judgment on Bradley's 1983 claim is REVERSED and judgment is entered in their favor on those claims. In addition, defendants

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Simpson, White, Crouse, Thomson and Chief Kitchen are entitled to governmental immunity pursuant to Michigan Compiled Laws § 691.1407(2). Accordingly, the district court's denial of the defendants' motion for summary judgment on Bradley's state law claims is REVERSED and judgment is entered in their favor on those claims. The remaining § 1983 claim against Chief Kitchen, on which the parties did not appeal the denial of summary judgment, is remanded to the district court.

KEITH, Circuit Judge.

I concur in the majority's disposition of the claims Bradley has alleged against Dispatcher White, Cadet Crouse, and Chief Kitchen. I, however, am compelled to depart from the majority with regard to Bradley's claims against Officer Simpson and Lieutenant Thomson for acts of **deliberate indifference** and gross negligence.

## I. Deliberate Indifference

A plain application of the **deliberate indifference** standards in this circuit and by the Supreme Court affirms that Bradley has stated viable claims of **deliberate indifference** against Officer Simpson and Lieutenant Thomson. As the majority has acknowledged, Majority Op. at ----, the Supreme Court set forth the standard for evaluating claims of **deliberate indifference** in *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994):

We hold ... that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

This circuit has repeatedly taken a two-step approach in applying the standard of *Farmer:* we have required that claims of **deliberate indifference** satisfy (1) an objective component, and (2) a subjective component. *Estate of Carter v. City of Detroit,* 408 F.3d 305, 311 (6th Cir.2005) ("There are two parts to the claim, one

objective, one subjective."); *Johnson v. Karnes,* 398 F.3d 868, 874 (6th Cir.2005) ("A claim for the deprivation of adequate medical care 'has two components, one objective**516 and one subjective.' ") (internal citation omitted); *Blackmore v. Kalamazoo County,* 390 F.3d 890, 895 (6th Cir.2004) (same); *Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir.2001) (same). Under the objective component, we require a claimant to establish the "existence of a 'sufficiently serious' medical need." *Estate of Carter,* 408 F.3d at 311; *Blackmore,* 390 F.3d at 895 (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970); *Comstock,* 273 F.3d at 703. Under the subjective component, the claimant must show that the defendant possessed "a sufficiently culpable state of mind," *Estate of Carter,* 408 F.3d at 311, such that the defendant knew of but nonetheless disregarded the claimant's serious risk of harm.

**\*\*14** In the instant case, the majority concedes, and I agree, that suicidal tendencies constitute a medical need that is sufficiently serious to satisfy the objective component of the **deliberate indifference** standard. Majority Op. at ----. *See also Comstock,* 273 F.3d at 703 ("We have held that a prisoner's 'psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies.' ") (quoting *Horn v. Madison Cty. Fiscal Ct.,* 22 F.3d 653, 660 (6th Cir.1994)).

Having satisfied the objective component, Bradley's claim must also satisfy the subjective component. Inasmuch as I believe that the evidence, viewed in the light most favorable to Bradley, permits a jury to reasonably conclude that Officer Simpson and Lieutenant Thomson both perceived that Bradley posed a serious risk of harm to himself and that they disregarded that risk, I would hold that Bradley has stated a viable claim of **deliberate indifference** against those two officials. To meet the subjective component, the evidence must permit a reasonable jury to find that Officer Simpson and Lieutenant Thomson each possessed a "sufficiently culpable state of mind." *Estate of Carter,* 408 F.3d at 312. To do that, Bradley must show that "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that he then disregard that risk." *Comstock,* 273 F.3d at 703 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970). "**Deliberate indifference** 'entails something more than mere negligence,' but can be 'satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Blackmore,* 390 F.3d at 895-96 (quoting *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970).

In the present case, the evidence established that Officer Simpson and Lieutenant Thomson both witnessed Bradley state that he wanted either to shoot himself or to be shot by a police officer. After hearing the statement, Officer Simpson demonstrated sufficient concern for Bradley's mental state and reported it to Lieutenant Thomson, who had in fact heard the statement himself. Out of concern that Bradley was likely suicidal, Lieutenant Thomson directed that Bradley's prisoner intake file be flagged with a red sticker to indicate he was likely suicidal. Officer Simpson was present at the time and knew that Bradley had been red-flagged as suicidal. In my view, this set of facts, viewed in the light most favorable to Bradley, sufficiently demonstrates that Officer Simpson and Lieutenant Thomson both perceived that Bradley posed a serious risk of harm to himself.[FN1]

> **FN1.** Based on Officer Simpson's deposition testimony, the majority asserts that "[a]lthough Simpson believed that Bradley had made the remark [about shooting himself] in jest, he reported it anyway just to be safe." Majority Op. at ----. Officer Simpson's after-the-fact attempt to discount Bradley's suicidal statement does not square with his actions at the time that the statement was made. At that earlier time, he thought the remark was serious enough that he should report it to his command officer. Moreover, Officer Simpson's belated assessment in this regard merely creates a genuine issue of material fact concerning what he actually perceived, and the majority's reliance on it does not view the evidence in the light most favorable to Bradley.

**\*517** The evidence, I believe, equally establishes that Officer Simpson and Lieutenant Thomson disregarded that risk. A jury could reasonably conclude that despite having knowledge of the serious risk that Bradley posed to himself, Officer Simpson recklessly disregarded that risk when he gave Bradley two blankets. The majority errs by concluding that "[w]hile it is true that Simpson gave Bradley the blankets, there is *no evidence* that he did so knowing that Bradley might attempt to hang himself," Majority Op. at ---- (emphasis added), and that "[e]ven if the court were to find that Simpson should have known of the risk presented when giving Bradley the blanket, when an official fails to act in the face of an obvious risk of which she should have known but did not, the official has not inflicted punishment in violation of the Eighth Amendment," *Id.* at ----. These conclusions are in error for two reasons. First, as discussed above, there is evidence that Officer Simpson personally perceived the risk that Bradley "might attempt" to commit **suicide**. Officer Simpson heard Bradley make a statement evincing suicidal tendencies, and he considered the statement sufficiently significant that he reported it to Lieutenant Thomson. Officer Simpson also knew that Lieutenant Thompson had decided that Bradley's prisoner intake file should be flagged with a red sticker indicating he was suicidal. Both of these events occurred in Officer Simpson's presence before he gave Bradley two blankets. Thus, there is evidence that Officer Simpson knew Bradley might attempt to harm himself when he gave him the blankets.

**\*\*15** Moreover, the majority's holding implies that the standard for a **deliberate indifference** claim requires Officer Simpson to have known that Bradley would harm himself. That is not the rule. Bradley must show only that Officer Simpson perceived *the risk* and disregarded that risk. Knowledge that harm would result is not required. "[A] plaintiff need not show that the official acted 'for the very purpose of causing harm or with knowledge that harm will result.'... Instead, '**deliberate indifference** to a substantial risk of serious harm to a prisoner is the equivalent of *recklessly* disregarding that risk.' " *Comstock,* 273 F.3d at 703 (quoting *Farmer,* 511 U.S. at 835-36, 114 S.Ct. 1970) (emphasis added) (internal citation omitted). Viewed in the light most favorable to the non-moving party, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

record evidence in this case demonstrates that Officer Simpson recognized the risk and subsequently disregarded it.

Turning to Lieutenant Thomson, the evidence demonstrates that he heard Bradley's suicidal statement, instructed the dispatcher to place a red sticker on Bradley's prisoner intake file, and at some point thereafter saw Bradley in his cell with the blankets. The majority shields Lieutenant Thomson of any liability because he "made provisions to have [Bradley] transferred to a facility which was better equipped to provide for his needs." Majority Op. at ----. In my view, arranging Bradley's transfer does not absolve Lieutenant Thomson of his obligation to provide for Bradley's medical needs while Bradley remained under his care. As the majority makes clear, Lieutenant Thomson, as the on duty command officer, had a multitude of options at his disposal for dealing with suicidal detainees. *See* Majority Op. at **\*518** ----, ----, and ----. Yet, after recognizing the risk that Bradley posed to himself, Lieutenant Thomson did nothing.

For the above reasons, I would affirm the district court's denial of summary judgment with regard to Officer Simpson and Lieutenant Thomson.

## II. Gross Negligence

Inasmuch as I conclude that a genuine issue of material fact exists as to whether (1) Officer Simpson acted with gross negligence in giving blankets to a detainee who he knew presented a suicidal risk, and (2) Lieutenant Thomson acted with gross negligence because after designating the detainee as suicidal he observed him with blankets but did not monitor him or remove the blankets, I would affirm the decision of the district court. Police officers take prisoners as they find them. Here, Bradley was suicidal. The evidence indicates that the officers knew he was suicidal. Despite this knowledge, Officer Simpson gave him two blankets and Lieutenant Thomson observed him with the blankets but did not remove the blankets or closely monitor Bradley. The police officials did not merely fail to act; rather, their joint actions worsened Bradley's fate. Under these circumstances, I would hold that a jury could

reasonably conclude that Officer Simpson and Lieutenant Thomson were "the one most immediate, efficient, and direct cause preceding" Bradley's death. *Robinson v. City of Detroit,* 462 Mich. 439, 613 N.W.2d 307, 317 (2000).

**\*\*16** None of the cases cited by the majority support its conclusion that Officer Simpson and Lieutenant Thomson cannot be liable for gross negligence resulting in the death of Bradley. This case is not at all like *Kruger v. White Lake Twp.,* 250 Mich.App. 622, 648 N.W.2d 660, 662 (2002), in which the plaintiff was left alone in the booking room "and was eventually able to maneuver her way out of the handcuffs and escape. As she fled from the police station, she ran into traffic and was hit by an unidentified vehicle." The present case is equally distinguishable from *Scott v. Charter Twp. of Clinton,* No. 233266, 2002 WL 31160298 (Mich.Ct.App. Sept.27, 2002). In that unpublished case, police officers had arrested Scott during a domestic dispute and "Scott committed **suicide** by hanging himself with the drawstring from his pants." *Id.* Unlike in the present case, *Scott* did not involve the presence of any evidence showing that the officers had determined or even suspected the detainee was suicidal. In addition, Scott killed himself using a drawstring from his own clothing, and not using articles which had been provided by the police.

The majority's reliance on *Soles v. Ingham County,* 316 F.Supp.2d 536 (W.D.Mich.2004) is similarly misplaced. In *Soles,* the detainee committed **suicide** in his cell by hanging himself with his bed sheet. *Id.* at 540. The prison officials in *Soles,* however, had moved the detainee to an observation cell after he reported having suicidal thoughts to a corrections officer, arranged for his immediate evaluation by a mental health worker, transferred him to the psychiatric unit of St. Lawrence Hospital, and returned him to an observation cell upon his release from the hospital psychiatric unit. *Id.* at 539-40. In addition, the detainee underwent multiple therapy sessions with the prison mental health worker and "signed a 'no-harm contract,' agreeing not to harm himself or others and to notify a deputy if he felt he was going to harm himself or others," *Id.* at 540, all prior to being returned to the general population where he hanged himself. Hence,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

I am not persuaded that the district court's holding in *Soles* has any applicability to the case pending before this court.

**\*519** The majority holds that "it is clear that the one most immediate, efficient and direct cause of Bradley's death was his own act of hanging himself." Majority Op. at ---- - ----. If the majority is right, under Michigan law a detainee's **suicide** can never result from the gross negligence of police officers because, by definition, every successful suicidal detainee will have died from self-inflicted acts. I, however, have found no case law holding that a detainee's **suicide** can never result from the gross negligence of police officers. If this were so, it would make no difference whether the officers had supplied this known suicidal detainee with blankets, as they did, or with a noosed rope. After determining Bradley was suicidal, Officer Simpson gave him-and Lieutenant Thomson let him keep-blankets that he used to commit **suicide**. Under these circumstances, I believe a jury could reasonably conclude that these officers constituted the single most immediate, efficient and direct cause of Bradley's death.

**\*\*17** Thus, I respectfully dissent.

C.A.6 (Mich.),2005.
Bradley v. City of Ferndale
148 Fed.Appx. 499, 2005 WL 2173780 (C.A.6 (Mich.)), 2005 Fed.App. 0785N

Briefs and Other Related Documents (Back to top)

• 04-1474 (Docket) (Apr. 16, 2004)
• 04-1465 (Docket) (Apr. 15, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT B
TO MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT**

936 F.2d 573, 1991 WL 119523 (C.A.6 (Tenn.)) **(Cite as: 936 F.2d 573)**

Nance v. GriffinC.A.6 (Tenn.),1991.NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.) United States Court of Appeals, Sixth Circuit.

Emma Sue NANCE, individually and as administratrix of the estate of David Lee Nance, Plaintiff-Appellant,

v.

S. GRIFFIN, individually and in his official capacity, et al., Defendants-Appellees.

**No. 89-5808.**

July 3, 1991.

On Appeal from the United States District Court for the Eastern District of Tennessee, No. 86-00609; Jordan, J. E.D.Tenn.

AFFIRMED.

Before RALPH B. GUY, Jr. and DAVID A. NELSON, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

**\*1** In this 42 U.S.C. § 1983 action concerning the jail suicide of pretrial detainee David Lee Nance, plaintiff Emma Sue Nance, David Nance's mother and the administratrix of his estate, appeals from a district court order granting summary judgment for defendant City of Knoxville, Tennessee.—FN1 The plaintiff further contests the district court's denial of her post-judgment motion to amend her complaint to plead a cause of action for negligence under Tennessee law. Because we find that the plaintiff has failed to establish a constitutional violation, we affirm the order granting summary judgment for the City of Knoxville on plaintiff Nance's section 1983 claims. Since the district court could not exercise subject-matter jurisdiction over the plaintiff's proposed negligence claim absent a viable federal claim, we affirm the district court's order denying the plaintiff leave to amend her complaint.

FN1. Although the plaintiff originally named a host of city police officers and jail workers as defendants, her contentions on appeal focus solely upon her claims against the City of Knoxville. Accordingly, we need not consider the propriety of the district court's orders granting summary judgment for the various individual

defendants.

I.

On December 19, 1985, Knoxville police officers were summoned to a gas station where David Nance was "acting in a bizarre manner, stripping his clothes off, swinging his arms about wildly, not responding to those talking to him, [and] banging on his car[.]" (App. at 7).

Knoxville city police officers Steven Griffin, Greg Dyke, and Steve Cianciola arrived at the gas station in response to the call, subdued and arrested Nance for disorderly conduct, resisting arrest, and attempted assault, and then transported him to the Knoxville City Jail. When David Nance was taken to the jail, Emma Sue Nance informed the arresting officers and jail officials that David had been in a mental hospital and requested that he be sent to the Veteran's Administration Hospital in Johnson City, Tennessee. Jail officials refused this request.

Bridgette Ann Patterson, a licensed practical nurse working at the city jail, saw David Nance on the morning of December 20, 1985. In response to information she received from night shift workers that Nance "had a mental problem" (App. at 568), Patterson called Knox County Mental Health Office coordinator Anne Edens. Edens examined Nance at the city jail on December 20, 1985, to make a preliminary assessment of his psychiatric needs. Edens ascertained that Nance

exhibited delusional-paranoid tendencies, and indicated that he required further examination regarding hospitalization for his psychiatric condition. On the same day, Judge Creekmore of the Knox County General Sessions Court ordered a forensic evaluation, rather than a civil commitment evaluation, to determine Nance's competency to stand trial and the possiblity of insanity at the time of the charged offenses. (App. at 245). By the terms of the order, Helen Ross-McNabb Center personnel were to perform the evaluation at the city jail and then provide a report to the court by December 30, 1985.

City jail doctor Dennis Drake examined David Nance on December 23, 1985, but Nance largely refused to cooperate in the examination process. Nance did tell Dr. Drake of his stay in a psychiatric hospital, however, and Nance's medical chart further revealed to Dr. Drake that Nance previously had received psychiatric hospitalization on ten occasions. (App. at 582). When nurse Patterson called the Knox County Mental Health Center on December 23, 1985, she discovered that the center had no order regarding a mental health evaluation for Nance. Thus, in response to a telephone inquiry, Patterson told Emma Sue Nance that she should "make bond and make arrangements for [David] to go" to a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mental health facility of her choice because the jail was powerless to take such action concerning psychiatric treatment without a court order. (App. at 606). Despite repeated calls from the jail, Helen Ross-McNabb Center personnel apparently failed to act promptly on the court order for a forensic examination of David Nance. However, Patterson did talk with David Nance at the city jail on December 24, 1985, and again on December 29, 1985, to check on his condition; she found his behavior relatively normal and of no problem to anyone. (App. at 595).

**\*2** After David Nance had been detained in the city jail for more than a week, a "trustee" handing out bed sheets gave one to Nance.[FN2] (App. at 150, 178, 229, 528). N a n c e hanged himself in his cell at approximately 3:50 a.m. on the morning of December 30, 1985, by using the sheet he obtained from the trustee. While making routine 4:00 a.m. rounds, jailer Marlon Goolsby found Nance hanging in his cell. (App. at 158). Goolsby summoned two other jailers who eventually opened the lock on the cell door that Nance apparently had jammed with plastic. The jailers immediately cut the sheet and called an ambulance, but Nance could not be revived.

> [FN2.](#) The term "trustee" generally refers to an inmate given the responsibility of performing carefully defined tasks in a jail or prison.

On August 15, 1986, plaintiff Emma Sue Nance filed suit on her own behalf and as administratrix of David Nance's estate. (App. at 5). Her complaint, which alleged purely federal claims, named as defendants the three officers who arrested David Nance, the City of Knoxville, and several Doe defendants identified only as police officers and jail employees. Four individuals identifying themselves as the Doe defendants successfully moved for summary judgment in 1987, thereby ostensibly leaving only the arresting officers and the City of Knoxville as defendants in the action. All four remaining defendants filed motions for summary judgment on August 8, 1988. The plaintiff failed to respond directly to the motions,[FN3] and the district court granted summary judgment with respect to all four defendants on September 6, 1988. (App. at 29-31). The plaintiff then moved to set aside the judgment in light of newly discovered information regarding the jail suicide. On October 14, 1988, the district court denied the plaintiff's motion with respect to the arresting officers,[FN4] but granted the motion with respect to the City of Knoxville.

> [FN3.](#) The plaintiff did seek a continuance, but the district court rejected the motion because "[t]his action has already been continued four times,

testing the patience of the defendants and the Court." (App. at 29-30).

> [FN4.](#) The district court correctly observed that the new information concerning the jail suicide had no bearing upon the plaintiff's [section 1983](#) claim to redress alleged fourth amendment violations committed by the arresting officers.

After further discovery, the City of Knoxville renewed its motion for summary judgment on March 1, 1989, and the plaintiff filed a timely response to the motion. The district court issued a memorandum opinion and order granting the City of Knoxville's motion for summary judgment on March 31, 1989. The district court determined that, although the plaintiff had established a negligence claim, the record could not support any claim of constitutional dimension. The plaintiff then filed a motion on April 10, 1989, seeking leave to amend her complaint to include a state law negligence claim. The district court denied the plaintiff's motion to amend on May 26, 1988, and this appeal followed.

Plaintiff argues on appeal that the district court erred in ruling that she failed to demonstrate a constitutional violation by the City. In addition, the plaintiff challenges the district court's denial of her post-judgment motion to amend her complaint. We shall initially address the plaintiff's alleged constitutional claims, and then consider her attempt to assert a state law claim following the entry of judgment.

## II.

Plaintiff's cause of action against the City is predicated upon her contention that the City failed to properly train its personnel. "In *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court formally recognized the failure to train theory, but restricted its application to cases 'where the failure to train amounts to deliberate indifference to rights of persons with whom the police come in contact.' " *Lewis v. City of Irvine, Kentucky,* 899 F.2d 451, 455 (6th Cir.1990) (quoting *Harris,* 489 U.S. at 388, 109 S.Ct. at 1204). Similarly, in *Molton v. City of Cleveland,* 839 F.2d 240 (6th Cir.1988), we explained that "[a] pretrial detainee's constitutional rights under the eighth and fourteenth amendments are denied by deliberate indifference to his serious medical needs...."

*Id.* at 243. Thus, the plaintiff's failure to train and eighth amendment claims both must be measured against the deliberate indifference standard.

### A.

**\*3** The plaintiff first contends that the City of Knoxville failed to adequately train its employees to anticipate and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

936 F.2d 573, 1991 WL 119523 (C.A.6 (Tenn.)) **(Cite as: 936 F.2d 573)**

prevent suicides. Under the governing standard, however, the City of Knoxville can be held responsible for David Nance's death only if its "failure to train reflects a 'deliberate' or 'conscious' choice...." *Harris,* 489 U.S. at 389. In this case, Randal Lockmiller, the city jail supervisor at the time of Nance's confinement, indicated at his deposition that, during his tenure, all jail employees received at least 40 hours per year of training from the Tennessee Corrections Institute (TCI) and 40 additional hours of training by the City of Knoxville Police Department. (App. at 395). Lockmiller further stated that some employees supplemented these 80 hours of annual training with courses offered by outside agencies. According to Lockmiller, the standard training courses included a four-hour session focusing exclusively on psychology and jail stress. (App. at 392). In sum, the training provided to Knoxville City Jail personnel was far more substantial than the program that we found constitutionally acceptable in *Beddingfield v. City of Pulaski, Tennessee,* 861 F.2d 968, 971-72 (6th Cir.1988). We commented in *Beddingfield* that the City's decision to exclude its jail personnel from TCI training did not amount to a constitutionally impermissible failure to train "because the City provided its own in-house training program." *Id.* at 971. Here, Knoxville City Jail personnel were given both in-house and TCI training. Accordingly, the training received by city jail personnel was clearly adequate by constitutional standards; "[t]he need for specific training in suicide prevention beyond what the [employees] received ... is not 'so obvious' that the city's policy may be characterized as 'deliberately indifferent.' " *Dorman v. District of Columbia,* 888 F.2d 159, 164 (D.C.Cir.1989) (applying *Harris* ).

The plaintiff further argues that the City's training was inadequate or flawed with respect to use and supervision of trustees. The city jail's policy and procedure manual contemplates the selection of trustees by the supervisor or senior officer on duty (App. at 92), but trustees' responsibilities are explicitly limited to ministerial tasks performed under the supervision of jail personnel. (App. at 104, 522). Jail supervisor Lockmiller opined that "it was an accident on the part of the trustees" to give Nance a sheet. (App. at 520). The district court correctly characterized the poor supervision of the trustees passing out sheets as negligent (App. at 541), but concluded that the City's failure to thoroughly train all employees in the precise methods for handling trustees did not amount to deliberate indifference. (App. at 539-40). The plaintiff has offered no evidence or explanation to support the contention that inadequate training in the handling of trustees commensurate with "deliberate indifference" occurred. Instead, the plaintiff has established a negligent deviation from the clear directive limiting the use of trustees. This showing is insufficient to support a failure to train

claim. *See Beddingfield,* 861 F.2d at 972.

B.

**\*4** The plaintiff's eighth amendment claim for improper treatment of David Nance's psychiatric condition requires us to apply *Estelle v. Gamble,* 429 U.S. 97 (1976), a decision in which the Supreme Court recognized a cause of action for "deliberate indifference to serious medical needs of prisoners...." *Id.* at 104. We have specifically explained how this cause of action applies to jail suicides:

[I]n a § 1983 action against a city for failing to prevent the suicide of a pre-trial detainee, a plaintiff must prove deliberate indifference; and that deliberate indifference constitutes the purposeful punishment necessary for finding a fourteenth amendment violation. We specifically rejected the contention that such an action could be maintained on a theory of mere negligence. The conduct for which liability attaches must be more than negligence, it must demonstrate deliberateness tantamount to an intent to punish.

*Molton,* 839 F.2d at 243 (citation omitted). Under this standard, the plaintiff clearly cannot establish an eighth amendment violation with respect to David Nance's treatment or his subsequent suicide. In less than two weeks of confinement, Nance received medical attention on numerous occasions from nurse Patterson, he was examined by Dr. Drake, and Anne Edens performed a psychological evaluation of Nance soon after he arrived at the city jail. Moreover, he was scheduled for a forensic examination on or before December 30, 1985, and jail personnel repeatedly contacted the Helen Ross-McNabb Center to hasten the examination process. Any inadequacies in David Nance's care and treatment cannot be attributed to the City of Knoxville. Thus, the entry of summary judgment on the plaintiff's eighth amendment claim was entirely appropriate.

III.

Our decision concerning the City of Knoxville's summary judgment motion mandates denial of the plaintiff's post-judgment request for leave to amend. Dismissal without prejudice of pendent claims generally is required once all federal claims are dismissed. *See, e.g., Service, Hosp., Nursing Home and Pub. Employees Union, Local No. 47 v. Commercial Property Serv., Inc.,* 755 F.2d 499, 506 & n. 9 (6th Cir.1985). Here, the plaintiff seeks to plead a state law negligence claim following the dismissal of all federal claims. Since dismissal of such a cause of action would be necessary under *Commercial Property* even if the cause of action had been set forth in the plaintiff's original complaint, *see id.,* we cannot

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

936 F.2d 573, 1991 WL 119523 (C.A.6 (Tenn.)) **(Cite as: 936 F.2d 573)**

permit post-judgment amendment to state such a cause of action in the absence of a viable federal claim.

AFFIRMED.

GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge, dissenting.
The plaintiff appeals from the dismissal of her suit against the city of Knoxville for failure to take the necessary steps to prevent her son's suicide while he was held in the city jail. There is no question that the young man was totally irrational at the time, and, in need of treatment for his mental condition.
 In my view, this case should not have been decided on summary judgment without a hearing or trial and I vote to send it back for trial.

C.A.6 (Tenn.),1991.

Nance v. Griffin
936 F.2d 573, 1991 WL 119523 (C.A.6 (Tenn.))

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT C**
**TO MEMORANDUM IN SUPPORT OF**
**SUMMARY JUDGMENT**


Inman v. WilsonTenn.App.,1988.Only the Westlaw citation is currently available.
SEE COURT OF APPEALS RULES 11 AND 12
Court of Appeals of Tennessee.
Roy L. INMAN, and Wife, Gale V. Inman,
Plaintiffs/Appellants,
v.
Kenneth WILSON, et al., Defendants/Appellees.
Feb. 8, 1988.
Opinion on Petition to Rehear March 4, 1988.
Permission to Appeal Denied by Supreme Court May 23, 1988.


C.A. 61, Monroe Circuit, Mayo Mashburn, J.

Larry B. Nolen, Athens, for appellants.
Robert H. Watson, Knoxville, for appellees.

OPINION
WILLIAM H. INMAN, Special Judge.
**\*1** A 25-year old single woman was arrested by policemen of the City of Sweetwater for public drunkenness. She was taken to the City jail and placed in a cell where she committed suicide about 2 hours later by hanging which she accomplished by fashioning a noose from a pullover blouse. While standing on the cell cot she was able to reach an exposed metal bar in the ceiling to which she tied her blouse with a double knot. Death by strangulation resulted when she stepped off the cot.

The action by her parents seeks to recover damages for her death. They allege that the City of Sweetwater, and certain of its police officers, breached their duty to exercise reasonable care for the safety of their daughter, Cindy June Inman, by failing to (1) provide her with adequate prisoner clothing, (2) make cell checks, (3) restrain and constantly monitor her because they knew or should have known of her suicidal tendencies, (4) maintain a safe jail, and (5) properly train police officers.

The defendants filed a common answer, admitting the death by suicide of Cindy June Inman, and the roles of the various officers in her arrest and incarceration. The defendants insist that her death by her own hand was a deliberate, intentional act, of which the sole, proximate cause was inherent in the act itself. They denied all allegations of negligence; denied that they knew or should have known that their prisoner was suicidal, and especially pleaded that the deceased was guilty of contributory negligence.

The defendant City of Sweetwater also pleaded the bar of sovereign immunity pursuant to the Governmental Tort Liability Act, TCA 29-26-101 et seq, but this defense was not thereafter mentioned during the trial below or on appeal, and we accordingly do not further notice it.

Following a bench trial the Court ruled, in pertinent part,

"... there must be a duty owned, there must be a breach of that duty, and that breach must be the proximate cause of the death of Cindy June Inman. The Court finds that a duty was owned to Cindy June Inman. That duty was to protect her against harm from herself and from others ... The defendants were required to act as reasonable persons and to exercise reasonable and ordinary care for the safety of Cindy Inman. The degree of care or the standard of care required is directly related to the nature of the person to whom the duty of care is owed and the circumstances giving rise to that duty....

[The officers] were confronted with a 25-year old young lady whom they had legitimately arrested for public drunkenness.... The Court finds that Miss Inman was intoxicated but not to the extent that she was bereft of reason.... She was indeed intoxicated, but certainly not to the extent that she did not know what she was doing....

[It is] the plaintiffs' insistence that Miss Inman's remarks to the effect that she did not have a belt but wished that she did should have put the officers on notice that she possessed suicidal tendencies.... The Court finds that such a remark when coupled with other ... remarks were not such as to put a reasonable person on notice that she possessed suicidal tendencies.... It is the finding of this Court that the defendants did not breach any duty of care they owed to this young lady....

**\*2** This Court is fully aware of the fact that there existed some shortcomings in the [jail] and in the degree of training of some of their office personnel. I'm fully aware of that. However, this Court recognizes that we do not live in a perfect world and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the jail facilities in Sweetwater and the training and experience of their police officers are not what we would like to have, but living with the realities of the time and the budgetary restraints imposed upon our local governments the Court concludes that they were adequate under the facts and circumstances of this case....

[It is] the Court's finding that no reasonable person would have expected this young lady to commit such a tragic and unnatural act simply because she was charged with the offense of public drunkenness. Her actions were contrary to human nature, and [were] the result of a deliberate, independent act to take her own life."

Judgment was entered dismissing the complaint, and the plaintiffs-appellants present for review five (5) issues, three of which concern the related questions of duty, breach of duty, and intervening cause and which will be considered generally.

## II

The Tennessee Corrections Institute was created in 1974. T.C.A. 41-7-101 et seq. One of its functions is to establish minimum standards for local jails, TCA 41-4-140(1), to inspect such jails, and to publish the results of such inspections. The Institute is vested with plenary authority to establish and enforce procedures to insure compliance with the standards it adopts; the failure of a city to comply with these standards is to be reported to its Mayor, and the Institute is required to order that all deficiencies described in its report shall be corrected.

So far as this record reveals, the Sweetwater jail was first inspected in 1981. Various violations were noted, and reported to the City. One of these violations was the absence of a special purpose cell, a so-called drunk tank, which would safely confine a prisoner. Among its safety features was the absence of any structural projections which would facilitate any attempt by a prisoner to harm himself. The deficiency was not corrected, and the Institute apparently did not force the issue. It made subsequent inspections, all critical of the jail; some improvements were made, but the cell in which Cindy June Inman was confined remained in its original condition. Metal bars in the ceiling were exposed and readily accessible.

The facts are essentially undisputed. Ms. Inman was observed by patrolling officers slumped over the

steering wheel of her parked automobile. She was intoxicated, somewhat belligerent and argumentative, but was neither incoherent nor helpless. At the jail she was asked if she had a belt, to which she replied "no, but I wish I did". The significance and meaning of this cryptic statement was the subject of considerable expert testimony, disputatious in nature, none of which seemingly reflected upon the reason why the question was asked in the first place. Standing alone, we cannot agree that the statement foreclosed the issue of notice and intent.

*3 The appellants insist that, given the unsafe jail condition, this statement by Ms. Inman should have alerted the defendants to her potential suicide. There were no other indications that she would destroy herself; both parents deny that she ever evinced any intention to do so. The trial judgment found that there was insufficient evidence to alert the officers that Ms. Inman was suicidal, and we cannot say that the evidence preponderates against this finding. She had no prior history of suicide attempts, and her parents conceded that they had never observed in her any indication of self-destruction. She was employed, in good physical health, and of sound intelligence. We think the evidence preponderates in favor of the trial court's finding, Rule 13(d) T.R.A.P., that she was not so bereft of reason that her agency was impaired, and that her intentional act was an efficient, intervening and unforeseeable cause which bars recovery.

In Lancaster v. Montesi, 390 SW2d 217, (1965) the Supreme Court had for consideration an action for damages for wrongful death of a woman who committed suicide by jumping from a Mississippi River bridge. It was alleged that the defendant directly caused the suicide of his paramour, and his actions were graphically described. The issue was not so much whether a duty of care and breach thereof existed, but, rather, one of proximate cause:

"An act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a a disordered mind, should be deemed to be a new and independent, efficient cause of the death that immediately ensures."

The appellants recognize this principle, but insist that the appellees had a duty to the decedent, since they imprisoned her against her will, to prevent her suicide, which could have been accomplished if they had maintained a safe jail, i.e., one that comported with the standards of the Tennessee Corrections Institute. But this argument essentially begs the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

question, since the standards are mainly designed to minimize, or eliminate, death or injury from an extraneous agency. Obviously, if the defendants were alerted to her potential for self-destruction, they owed Ms. Inman the duty to save or attempt to save her from herself; such duty is clear and a breach of it would not in our judgment be overridden by her subsequent voluntary knowledgeable act. We cannot, upon a de novo review, say that the finding by the trial court that "no reasonable person would have expected this young lady to commit such a tragic and unnatural act simply because she was charged with the offense of public drunkenness" is contrary to the preponderance of the evidence. *Watts v. Civil Service Board,* 606 SW2d 274 (Tenn.1980); *Brungard v. Caprice Records, Inc.,* 608 SW2d 585 (Tenn.1980).

One issue remains. Appellants pose the question of whether the Court erred in concluding that even though the City of Sweetwater was negligent in training their (sic) officers and were (sic) also negligent in providing a safe jail that they (sic) should be nevertheless relieved of the said negligence because of the "budgetary restraints"?

**\*4** We have heretofore reproduced the comments of the trial judge. The presented issue to an extent removes them from context, and we do not ascribe to them the sinister meaning adopted by the appellants. A lack of funds, or a reluctance to appropriate funds, for a "safe and comfortable prison" cannot be countenanced. See, Constitution of Tennessee, Act 1, Sect. 32.

The judgment is affirmed, at appellants' costs.

SANDERS, P.J., and ANDERSON, J., concur.

OPINION ON PETITION TO RE-HEAR
INMAN, Special Judge.
The petition to re-hear essentially re-argues the case and presents no fact or theory this Court has not previously and fully considered.

Reduced to simplest expression this State has neither by legislative enactment nor by decisional expression allowed the recovery of damages for untrammeled suicide.

The petition is denied at Appellant's costs.

DANDERS, P.J.(E.S.), and ANDERSON, J., concur.
Tenn.App.,1988.
Inman v. Wilson

Not Reported in S.W.2d, 1988 WL 9798 (Tenn.Ct.App.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.