IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LORRIE EICHER, personal )
representative for Robert )
Lambert, Jr., deceased )
)
v. ) NO. 3:05-1045
)
HUMPHREYS COUNTY SHERIFF )
RONNIE TOUNGETTE, BONNIE )
ROBINSON, and HUMPHREYS )
COUNTY, TENNESSEE )

**MEMORANDUM**

Pursuant to 28 U.S.C. § 636(c), the parties in this action consented to have the Magistrate

Judge conduct any and all proceedings including the entry of final judgment. See Docket Entry

Nos. 14 and 15.

Presently pending before the Court is the defendants' motion for summary judgment (Docket

Entry No. 22).

**I. BACKGROUND**

During the afternoon of March 22, 2005, Robert Lambert, Jr., ("Lambert") died as the result

of hanging himself in a cell at the Humphreys County Jail ("Jail"). He had been arrested the prior

day and was being held at the Jail as a pretrial detainee. On December 15, 2005, Lambert's father,

Robert Lambert, Sr., as the personal representative[1] for the estate of Lambert, filed the instant

lawsuit seeking damages under 42 U.S.C. § 1983 for violations of Lambert's civil rights and gross

negligence. The plaintiff also seeks damages for negligence under the Tennessee Governmental

Tort Liability Act, T.C.A. § 29-20-205 ("TGTLA"). The defendants are: Humphreys County,

---

[1]Lambert's father was the original personal representative. Lorrie Eicher, Lambert's sister,
was named the personal representative upon the death of her father and she was substituted as the
named plaintiff in this action by Order entered March 16, 2007. See Docket Entry No. 41.

Tennessee ("Humphreys County"); former Humphreys County Sheriff Ronnie Toungette, named in only his official capacity; and Bonnie Robinson, who is named in only her individual capacity.[2]

On March 21, 2005, Lambert was arrested by Humphreys County Sheriff's Department ("Sheriff's Department") Deputies Jeremy Ethridge and Dan Long. The deputies had received a dispatch about a car driving recklessly and saw a car matching the description in a parking lot. Lambert, who was outside the car at the time, admitted to driving the car, which had also been reported as stolen. Lambert was placed under arrest without incident and a search of the car uncovered marijuana, pills, and a syringe.

Lambert was booked into the Jail at 3:15 p.m on drug charges. As part of the booking procedure, the following personal possessions were taken from him and inventoried: boots, one silver necklace, one black billfold, $35.00 in cash, and several miscellaneous cards. See Exhibit No. 10 to Docket Entry No. 35. Lambert was also questioned by Deputy Ethridge. During booking, Lambert was coherent but was nodding off and falling asleep. He was not fingerprinted or photographed because of his condition. Lambert admitted to having used drugs that day, including injecting cocaine, but denied to Ethridge that he was suicidal. Lambert exhibited no signs during the booking that he was harmful to himself or others. He was asked by Ethridge if he were taking medications and stated that he was seeing a physician and was taking Xanax, Lithium, Ambien, Protonix, and Percoset. See Humphreys County Jail Intake Card, Attachment to Exhibit No. 4 to Docket Entry No. 35. Included in the wallet taken from Lambert were business cards for employees of both the Mental Health Cooperative and the Tennessee Christian Medical Center, an appointment

---

[2]Eric Jernigan and Jeremy Wheeler were named as defendants in the original complaint. However, the plaintiff dropped the claims against them in the subsequently filed amended complaint (Docket Entry No. 42). By Order entered March 16, 2007 (Docket Entry No. 41), the Court denied the plaintiff's request to add David Cecil, Paula Miller, and Nidia Taylor in place of the "John Doe" defendants who had been listed in the original complaint.

2

card for an appointment with a psychiatrist, and a business card for an alcohol and drug addiction recovery house.[3]

Despite the Sheriff's Department having a written policy that all belts and shoe laces were to be removed from prisoners prior to their being placed in a cell at the Jail, Lambert's belt was not removed and only his boots were taken from him. He was also not placed in an inmate jumpsuit. Lambert was escorted to a single cell by Jailer Nidia Taylor ("Taylor") and Deputy Brian Baker ("Baker"). The cell in which Lambert was placed, cell No. 1, had a video monitor but the monitor was not working at the time because it was in the process of being repaired.

During his escort of Lambert, Baker questioned Lambert about his condition. He asked Lambert whether he was a mental patient and whether he was homicidal or suicidal. In his deposition, Baker testified that Lambert hesitated and did not respond to the first question and then replied that he was not homicidal. Baker then asked him if he had ever been suicidal. Baker testified that Lambert replied "yes." Baker placed Lambert in the cell and testified that he told Taylor something to the effect of "you might want to keep an eye on him." Baker testified that Taylor acknowledged him by nodding her head. Baker does not remember telling anyone else about Lambert's comments. See Baker Deposition, Exhibit No. 5 to Docket Entry No. 35. Taylor denies having any conversation with Baker about Lambert. See Taylor Deposition, Exhibit No. 6 to Docket Entry No. 35. The Jail logbook contains no mention of Lambert's comment.

The cell block of the Jail was checked periodically during the afternoon and evening of March 21 and during the early morning hours of March 22. Nothing unusual was noted concerning Lambert. At 6:00 a.m. on the morning of the 22nd, a shift change occurred at the Jail and Jailers Bonnie Robinson, Paula Miller, and David Cecil came on duty. Between 6:00 and 8:00 a.m., activity occurred in the cell area of the Jail including trustees being let out of their cells, breakfast

---

[3] Lambert's wallet also included his medical insurance card, a photo identification, his social security card, business cards for a bail bond company, a paralegal, and a public defender, and two cards with unidentified persons' names and telephone numbers. See Exhibit No. 1 to Docket Entry No. 35.

3

trays being served and picked up, and medication being passed out.  See Jail Log, Exhibit No. 11 to Docket Entry No. 35.  Nothing unusual was noted concerning Lambert during this time, and he was observed alive by other inmates at the Jail during these morning hours.

The Jail Log does not reflect that the cell area was checked by Jail personnel at anytime between 8:00 a.m. and 2:00 p.m. on March 22.  Id.  Lunch was served to the inmates sometime around noon.  However, it was served by a Jail trustee and there is no indication that any Jail personnel entered the cell area at this time.  At approximately 2:00 p.m. on the afternoon of March 22, Defendant Robinson went into the cell area of the Jail in response to inmate noise coming from the cell area.  She discovered Lambert hanging in his cell from his belt, one end of which had been woven through air grates in the ceiling of the cell.  Emergency personnel were called to the Jail but they were unable to revive Lambert.

After Lambert's death, the Tennessee Bureau of Investigation conducted an investigation and concluded that no criminal activity had occurred related to the death and that Lambert had committed suicide without the assistance of others.  See Exhibit No. 2 to Docket Entry No. 35 at 8-10.


## II. THE MOTION FOR SUMMARY JUDGMENT, RESPONSE, AND REPLY

The defendants seek summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  With respect to the claim against Humphreys County and Sheriff Toungette in his official capacity, they contend that the plaintiff cannot show that a custom or practice at the Jail caused Lambert's death as is required for a claim of municipal liability.  With respect to the claim against Bonnie Robinson in her individual capacity, Defendant Robinson asserts that the undisputed facts show that she did not have any interaction with Lambert prior to his death and did not act with deliberate indifference to the risk of suicide on the part of Lambert.  The defendants finally argue that, upon the dismissal of the plaintiff's Section 1983 claims, the Court should not exercise supplemental jurisdiction over the plaintiff's state law negligence claim under the TGTLA.

4

Alternatively, the defendants argue that, should the Court continue to exercise jurisdiction over the TGTLA claim, the claim should be dismissed based on the undisputed facts.

The plaintiff responds by asserting that sufficient factual questions exist to warrant the denial of the defendants' summary judgment motion. The plaintiff contends that, at the time Lambert was booked into the Jail, facts existed which placed Jail personnel on notice or should have placed them on notice that Lambert was at risk for suicide. Further, the plaintiff asserts that the undisputed facts show that policies at the Jail regarding inmate dress, cell block checks, and the notation of critical information in the Jail logbook were not followed and that some Jail personnel had not received the proper amount of training. The plaintiff argues that these shortcomings directly contributed to Lambert's death and are sufficient to raise a question of whether de facto policies existed at the Jail which were contradictory to the Jail's published policies.

The plaintiff further argues that jurisdiction should be retained over the state law claim because of financial and other considerations. The plaintiff contends that sufficient questions of fact exist on the issue of negligence to warrant the denial of dismissal of the state law claim.

The defendants reply that there is no evidence that supports a constitutional claim against Defendant Robinson and that the evidence, even when viewed in the light most favorable to the plaintiff, shows merely that individual Jail employees failed to follow the established and appropriate policies at the Jail. The defendants contend that this scenario is not sufficient to establish a claim of municipal liability against Humphreys County.

### III. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." In order to prevail on a motion for summary judgment, the moving party must demonstrate that no genuine issue of material fact exists

5

and that judgment as a matter of law should be granted in the moving party's favor. Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979).

In considering a motion for summary judgment, the Court must view all facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. SEC v. Blavin, 760 F.2d 706 (6th Cir. 1985). The non-moving party, however, may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Cloverdale Equipment Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir. 1989).

Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. Id. at 248. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-89 (1968).

## IV. THE RELEVANT LAW

A. 42 U.S.C. § 1983

42 U.S.C. § 1983 does not confer rights upon an individual. Instead, it is a vehicle to seek a remedy for violations of constitutional rights guaranteed elsewhere. Graham v. Conner, 490 U.S. 386, 393-94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). A plaintiff proves a claim under Section 1983 by showing that: (1) the defendant was acting under color of state law; and (2) the defendant deprived the plaintiff of rights secured by the United States Constitution or laws of the United States. Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142

6

(1970). In addition to individuals, local government units may also be sued under Section 1983. Monell v. Dept. of Soc. Servs. of the City of New York, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978).

In this action, there is no dispute that the plaintiff has satisfied the "under color of state law" requirement for a Section 1983 claim. The only question is whether Lambert's constitutional rights were violated by the named defendants.


B. Lambert's General Civil Rights

The events at issue occurred while Lambert was a pretrial detainee at the Jail. Pretrial detainees have a constitutional right under the Fourteenth Amendment Due Process clause to the same protection afforded convicted prisoners who have serious medical needs. Heflin v. Stewart County, Tenn., 958 F.2d 709, 714 (6th Cir. 1992); Roberts v. City of Troy, 773 F.2d 720, 723 (6th Cir. 1985). It is well settled that the analysis utilized in Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), for the Eighth Amendment claims of convicted prisoners applies to pretrial detainees who assert the denial of adequate treatment for their medical needs. Danese v. Asman, 875 F.2d 1239, 1243 (6th Cir. 1989). See also Horn v. Madison County Fiscal Court, 22 F.3d 653, 660 (6th Cir. 1994).

To demonstrate a violation of this right, a plaintiff must satisfy two tests, one objective and one subjective. See Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Comstock v. McCrary, 273 F.3d 693, 702 (6th Cir. 2001). The objective component requires the plaintiff to "allege that the medical need at issue is 'sufficiently serious.'" Comstock, 273 F.3d at 702 (quoting Farmer, 511 U.S. at 834, 114 S.Ct. 1970). For the subjective component, the plaintiff must demonstrate that the prison official had a sufficiently culpable state of mind, in other words, that the official acted with "deliberate indifference" to the detainee's health or safety. Farmer, 511 U.S. at 834, 114 S.Ct. 1970.

7

To establish deliberate indifference, the plaintiff must allege facts which, if true, would show that the official being sued perceived facts from which to infer a substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk. Comstock, 273 F.3d at 703. See Farmer, 511 U.S. at 837. Although this standard does not require a showing that the defendant acted with a purpose or intent to inflict harm, the standard is not satisfied by a showing of negligence. See Comstock, 273 F.3d at 703 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not ... cannot under our cases be condemned as the infliction of punishment." (quoting Farmer, 511 U.S. at 838); Estelle, 429 U.S. at 105, 97 S.Ct. 285 ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute" a violation of the Eighth Amendment). A defendant will not escape liability, however, if he refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist. Comstock, 273 F.3d at 703. A fact-finder may conclude that a defendant knew of a substantial risk from the very fact that the risk was obvious. Farmer, 511 U.S. at 842.

C. Constitutional Protections Regarding the Risk of Inmate Suicide

A pretrial detainee's psychological needs which manifest themselves in suicidal tendencies may constitute serious medical needs for purposes of satisfying the objective portion of a detainee's Fourteenth Amendment claim. Horn, 22 F.3d at 660; Comstock, 273 F.3d at 711. See also Barber v. City of Salem, 953 F.2d 232, 239-240 (6th Cir. 1992). In Gray v. City of Detroit, 399 F.3d 612 (6th Cir. 2005), the Sixth Circuit Court of Appeals clarified what rights a pretrial detainee possesses with respect to his suicidal behavior. The pertinent inquiry is "whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure [by a defendant] to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs." Gray, 399 F.3d at 616 (quoting Barber, 953 F.2d at 239-40).

8

However, pretrial detainees do not have a constitutional right for municipalities to ensure, through supervision and discipline, that every possible measure be taken to prevent their suicidal efforts, see Gray, 399 F.3d. at 619, and there is no general constitutional right to be screened correctly for suicidal tendencies or to be placed in suicide-safe facilities absent facts showing that the detainee somehow demonstrated a strong likelihood of committing suicide. See Danese, 875 F.2d at 1244. See also Crocker v. County of Macomb, 119 Fed.Appx. 718, 724 (6th Cir. 2005) (unpublished) (finding no change in the law since Danese was decided in 1989). A defendant cannot be found liable for failing to prevent a suicide which was not foreseeable. Ellis v. Washington County and Johnson City, Tennessee, 198 F.3d 225, 227-28 (6th Cir. 1999). As the Sixth Circuit has noted, "[s]uicide is a difficult event to predict and prevent and often occurs without warning." Gray, 399 F.3d at 616.

D. Municipal Liability Under Section 1983

City or county governments are subject to suit under Section 1983. Monell v. Dep't of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, respondeat superior and vicarious liability do not apply in a Section 1983 claim against such a defendant and the governmental entity cannot be held liable merely because one of its employees has committed a constitutional violation. Gregory v. Shelby County, 220 F.3d 433, 441 (6th Cir. 2000) (citing Monell, supra); Molton v. City of Cleveland, 839 F.2d 240, 243 96th Cir. 1988). In Monell, the Supreme Court held that a municipality can be found liable under Section 1983 where a policy of the municipality itself causes the constitutional violation at issue. The Supreme Court said, "[i]t is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983." Monell, 436 U.S. at 694.

The plaintiff must show that the governmental entity was the "moving force" behind the violation of the constitutional rights at issue. City of Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (quoting Monell, 436 U.S. at 694). The plaintiff "must show that the

9

[County's] action was taken with the requisite degree of culpability and must demonstrate a direct casual link between the [County's] action and the deprivation of federal rights." <u>Gregory</u>, 220 F.3d at 442 (quoting <u>Board of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

Thus, in the context of a claim based upon a failure to adequately respond to a strong risk of suicide on the part of a prison inmate, the deliberate indifference standard applies to Humphreys County. <u>See</u> <u>Gray</u>, 399 F.3d at 616-18; <u>Barber</u>, 953 F.2d at 238-40. Humphreys County has "a duty ... to recognize, or at least not to ignore, obvious risks of suicide that are foreseeable," and to take reasonable steps to prevent an inmate's suicide "[w]here such a risk is clear." <u>Gray</u>, 399 F.3d at 618. However, "[d]eliberate indifference remains distinct from mere negligence. Where a municipal defendant does create reasonable policies, but negligently administers them, there is no deliberate indifference and therefore no § 1983 liability." <u>Id</u>. at 618 n. 1.

## V. LEGAL CONCLUSIONS

### A. Section 1983 Claim Against Defendant Robinson

Summary judgment should be granted to Defendant Robinson. The undisputed evidence shows that Defendant Robinson had no contact or interaction with Lambert during the time that he was at the Jail prior to his death. She was not involved in his arrest, in his booking into the Jail, or in transporting him to his cell. When she arrived for her shift at 6:00 a.m. on the morning of March 22, it is undisputed that she had not been told by the jailers on the prior shift about any risk of suicide on the part of Lambert and it is undisputed that there was not any written notation in the Jail Log or elsewhere to indicate that Lambert was at risk for suicide.

The plaintiff argues that Defendant Robinson failed to regularly check the cell area during her shift as was required by Jail policy and failed to promptly respond to banging sounds coming from the cell area. The plaintiff also appears to argue Defendant Robinson should have been aware that Lambert was at risk of suicide because notations in the Jail Log reflected that Lambert was

10

"very high" when he entered the Jail and she had been told by another deputy that Lambert had taken some kind of drugs on the day of his arrest.

The plaintiff's Section 1983 claim against Defendant Robinson fails because the evidence before the Court, even when taken in the light most favorable to the plaintiff, simply fails to show that Robinson acted with deliberate indifference to a strong likelihood that Lambert would take his own life. There is no evidence before the Court upon which a reasonable jury could find that Defendant Robinson either perceived or should have perceived that Lambert presented a strong risk of suicide. Robinson did not have actual knowledge from any interaction with Lambert which would support such a conclusion. Additionally, the evidence that the plaintiff relies on in support of her claim, a jail log entry stating that Lambert was "very high" and a verbal statement from Lambert to another officer that he had taken drugs the prior day, is simply insufficient to have alerted Robinson that Lambert presented a strong likelihood of committing suicide.

In light of the lack of any evidence supporting a conclusion that Defendant Robinson subjectively perceived a risk of suicide on the part of Lambert, her actions or inactions do not reflect deliberate indifference to this risk. At best, the evidence before the Court could be viewed as showing negligence on her part. Such evidence fails to support a claim under Section 1983. Farmer, 511 U.S. at 834; Miller v. Calhoun County, 408 F.3d 803, 813 (6th Cir. 2005); Comstock, 273 F.3d at 703.


B. Section 1983 Claim Against Sheriff Toungette

The plaintiff has sued Sheriff Toungette in only his official capacity. An official capacity suit is merely another way of pleading an action against an entity of which an officer is an agent. Monell, 436 U.S. at 691; Stemler v. City of Florence, 126 F.3d 856, 864 n.8 (6th Cir. 1997). Accordingly, the plaintiff's claim against Sheriff Toungette in his official capacity is duplicative of the claim against Humphreys County and requires no separate analysis.

11

C. Section 1983 Claim Against Humphreys County

        As set out <u>supra</u>, liability under Section 1983 can only be found against Humphreys County based upon a showing that a policy of Humphreys County was the moving force behind a violation of Lambert's constitutional rights.

        The plaintiff has not pointed to any written policy which she contends was the moving force behind the alleged violation of Lambert's constitutional rights. Instead, the plaintiff argues that the Jail's written policies were "completely ignored and apparently overridden by established custom and practice." <u>See</u> Plaintiff's Brief in Opposition (Docket Entry No. 35) at 23-24. The plaintiff argues that the written policies at the Jail were not followed by many Jail employees who interacted with Lambert on March 21-22 and that their non-compliance with the written policies should not be viewed as isolated instances of human error but as evidence of the actual customs or practices which were in effect at the Jail. <u>Id</u>. at 26-27.

        The plaintiff lists nine policies at the Jail which were not followed in the instant case:

        1. "That jailers be trained by the Tennessee Corrections Institute."

        The Court presumes that the plaintiff intends to refer to Jail Policy 1400-1-06(3), which states "[a]ll new jailers will be required to attend and complete a basic training program for 40 hours provided by the Tennessee Corrections Institute," and Policy 1400-1-.06(4), which states "[a]ll jailers will receive 40 hours in-service each year. 16 hours provided by the Tennessee Corrections Institute." Exhibit No. 12 to Docket Entry No. 35.

        2. "That inmates be checked for contraband."

        The Court presumes that the plaintiff intends to refer to Jail Policy 1400-1-07(1), which states "[e]ach newly admitted prisoner shall be thoroughly searched for weapons and other contraband immediately upon arrival in the facility, regardless of whether the arresting officer has previously conducted a search. Jailers will log search in daily activity reports" <u>Id</u>.

12

3. "That inmate property be inventoried."

The Court presumes that the plaintiff intends to refer to Jail Policy 1400-1-07(6), which states in part "[m]ake sure you take all personal property and money and lock it up. Give the inmate a receipt for their property and money." Id.

4. "That each person that comes in be searched for weapons and other contraband upon arrival regardless of whether the arresting officer had previously conducted a search."

The Court presumes that the plaintiff intends to refer to Jail Policy 1400-1-07(1) which is set out supra.

5. "All officers: when booking any prisoners, if they have lace-up shoes of any type, remove the laces. Also remove the belts before locking down."

This is verbatim from a sign posted on the wall in the booking area. It is also contained in Jail Policy 1400-1-07(6), which reads in part "[m]ake sure to take any belts and shoe or boot laces." Id.

6. "Make sure that you find out about any medical or mental problems. If the person is acting normal or violent. If the person has any suicidal tendencies."

This is verbatim from Jail Policy 1400-1-07(5). Id.

7. "If [you] have any information that an inmate may be suicidal or may have special problems, the inmate should be placed in cell number three where they can be monitored by the surveillance camera."

This is verbatim from Jail Policy 1400-1-07(9). Id.

8. "Inmates should be observed every hour, and inmates with special needs should be observed more often than every hour and logged in the logbook."

The Court presumes that the plaintiff intends to refer to Jail Policy 1400-1-07(11), which states "[j]ailer or deputies on duty will need to make a round through the cell block at least once an hour to make visual checks on inmates. Special need inmates and inmates on suicide watch will need constant observation." Id.

13

9. "The control center is equipped with sound and light, or sound and sight monitoring systems."

The Court presumes that the plaintiff intends to refer to Jail Policy 1400-1-04(16), which states "[c]ontrol center is located downstairs in the jailers office, equipped with sound and sight monitoring systems." Id.

The Court has reviewed the evidence before the Court and the arguments presented by the plaintiff. The majority of the plaintiff's examples of policies which were not followed fail to support a claim of municipal liability because, even if the evidence is viewed in the light most favorable to the plaintiff, all that the plaintiff has shown in the case of examples 2, 3, 4, 6, 7, 8, and 9 is that a written policy was either not followed or was negligently administered. Such a showing will not support a claim of municipal liability. Bradich v. City of Chicago, 413 F.3d 688, 690 (7th Cir. 2005); Gray, 399 F.3d at 618, n.1; Molton, 839 F.2d at 246-47; Roberts, 773 F.2d at 726 (citing Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984))("The mere failure to comply with a state regulation is not a constitutional violation."). The deliberate indifference test is not met by pointing to actions that, with the benefit of hindsight, could have been done better or differently. See Farmer, 511 U.S. at 838; Gray, 399 F.3d at 618-19.

This analysis holds true even with respect to the evidence of the comment Lambert made to Jailer Baker. Even if the Court takes as true that Lambert told Baker on the way to his cell that he had felt suicidal in the past and that Baker relayed to Jailer Taylor that she "should keep an eye" on Lambert,[4] these facts fall short of showing that an actual policy of Humphreys County was the moving force behind their actions. The jailers may have acted negligently in responding to this information, but there is no proof that their actions were in accordance with or in furtherance of a formal written policy at the Jail.

---

[4] The Sixth Circuit has found that a comment to a jail official that the official needed to "watch" an inmate who later committed suicide is not enough to show deliberate indifference on the part of the official. Starcher v. Correctional Medical Systems, Inc., 7 Fed. Appx. 459, 2001 WL 345810 (6th Cir. 2001).

14

The plaintiff has also not set forth any evidence that non-compliance with any of these seven written policies was the de facto policy at the Jail. It is important to note that the plaintiff's evidence does not show that the policies were completely ignored by the staff at the Jail. There is no evidence before the Court showing that the Jail operated in the absence of set policies or that Jail employees were left to their own devices to improvise in the performance of their duties. Merely showing non-compliance with a written policy in the single incident involving Lambert is not sufficient to show that a custom, which was in contradiction with an established written policy, existed and was the de facto policy in place at the Jail. See City of Oklahoma v. Tuttle, 471 U.S. 808, 823-23, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). This is especially true when the evidence shows that Jail staff were acting in an effort to implement the written policies and what the plaintiff complains about are shortcomings in their implementation of the policies. See Perez v. Oakland County, 466 F.3d 416, 432 (6th Cir. 2006).

Finally, even if such evidence were before the Court, the plaintiff has not satisfied the next step required for a claim of municipal liability and has not shown that Humphreys County adopted any kind of de facto policy with deliberate indifference to the consequences of such a policy. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." See Board of County Comm'rs of Bryan County, 520 U.S. at 410.

With respect to examples 2 and 6, the plaintiff also appears to argue that the suicide screening performed on Lambert was deficient. However, the undisputed evidence shows that the policy in place at the Jail was to conduct a screening of inmates prior to their placement in a cell which included assessing the possibility of a risk of suicide. The Jail employees did, in fact, inquire into the possibility of suicide by Lambert by directly questioning him. See Jail Intake Card, Attachments to Exhibit No. 4 to Docket Entry No. 35. They inquired about his medical history and whether he was seeing a physician. Id. They further observed him and noted that he exhibited no

15

outwardly visible signs of either suicidal behavior or psychotic behavior.[5]  See Deposition of Ethridge at 143-45, Exhibit No. 4 to Docket Entry No. 35; Deposition of Taylor at 180-83 and 192-93, Exhibit No. 6 to Docket Entry No. 35.  The actions taken during the intake screening were in accordance with the written policy at the Jail.

There is simply no evidence before the Court which shows that the policy at the Jail was to ignore the potential risks of suicide in newly admitted inmates and to place them in a cell without any type of screening.  To the contrary, the undisputed evidence shows the existence of a written policy to conduct an initial screening and that such a policy was followed with respect to Lambert.  As such, the evidence cannot reasonably be viewed as supporting a finding that Humphreys County had a policy with respect to the intake of inmates which was deliberately indifferent to the risk of suicide on the part of newly admitted inmates.  Indeed, the fact that a screening took place shows a lack of deliberate indifference on the part of Humphreys County toward the risk of inmate suicide.

The plaintiff argues that Jail employees should have searched the contents of Lambert's wallet and should have noticed cards in his wallet which indicated that he had some type of history of interaction with mental health professionals.  The plaintiff also argues that Lambert's admission during the intake screening that he was taking prescription medications should have been a red flag.  The plaintiff contends that, based upon this evidence, the employees involved in his screening should have either presumed that Lambert was at risk of suicide or investigated the risk of his suicide more thoroughly.

The major flaw in the plaintiff's argument is that she seeks to impose liability in a situation where Jail employees did not ignore clear and obvious evidence that a strong risk of suicide existed.  The evidence relied on by the plaintiff, the cards in Lambert's wallet and his statement of what prescription medications he was taking, did not clearly and obviously suggest that Lambert

---

[5] The fact that Lambert appeared to be in drug-induced stupor during his intake booking and alternated between being responsive and sleeping does not itself evidence a strong likelihood of suicide.  See Ellis v. Washington County and Johnson City, Tennessee, 198 F.3d 225, 226-27 (6th Cir. 1999).

presented a strong risk of suicide. They merely indicated that he had some type of mental health and/or substance abuse issue. Although neither party has presented evidence to the Court on whether mental health and/or substance abuse issues are commonplace among inmates being booked into the Jail, the Court assumes that an inmate entering the Jail with such problems would not be such an uncommon occurrence that knowledge of this information would be viewed as significant or remarkable. The plaintiff seeks to impose liability because the employees failed to correctly assess indirect evidence showing that Lambert suffered from some type of mental health issues and then failed to infer that a strong risk of suicide existed which needed further investigation. The plaintiff has pointed to no case law which supports this position, and the Court is unwilling to adopt it.

The plaintiff's reliance on Comstock v. McCrary, 273 F.3d 693 (6th Cir. 2001), is unpersuasive because both the facts and the legal issues in Comstock are readily distinguishable from the instant case. Comstock involved an inmate who had been placed on suicide watch because he presented obvious and strong risks of suicide. He was later removed from the suicide watch by a mental health professional and subsequently committed suicide. The defendant was sued for deliberate indifference in the act of removing the inmate from the suicide watch. Neither the issue of a jail inmate's initial screening or a municipal policy was involved in Comstock.

What the plaintiff is essentially arguing is that the policy at the Jail should have required a more thorough suicide screening during the intake interview. However, the Constitution does not impose a duty to conduct a suicide screening on incoming inmates, let alone one which is complete and thorough. Danese, 875 F.2d at 1244. See also Gray, 399 F.3d at 616. As the Sixth Circuit in Gray noted:

> [i]t is possible that, had the officers conducted a thorough screening for suicidal intent or kept a closer watch, Gray's suicide could have been prevented; but the Supreme Court has noted that "in virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.

399 F.3d at 618-19 (citing <u>Canton</u>, 489 U.S. at 392). The plaintiff's argument fails to support a constitutional claim in light of the undisputed facts which show that the Jail's policy was to screen newly admitted inmates and that this screening included a basic suicide assessment.

The plaintiff has provided the affidavit of Joseph McCarthy (attachment to Docket Entry No. 37) as an expert to support her claim. The Court has reviewed the affidavit and finds that it fails to provide evidence supporting a claim of municipal liability against Humphreys County. The plaintiff's expert primarily points out actions taken by individual jailers which he contends were improper or which were not in compliance with recommendations from the Tennessee Corrections Institute and the American Medical Association regarding the admission into a correctional facility. While the expert's opinion may be relevant to the actions of individual Jail employees, the expert fails to point to any policy of Humphreys County which is allegedly unconstitutional.

<u>Policy Regarding Removal of Belts and Shoe Laces</u>

The plaintiff argues that, contrary to the written policy at the Jail, the Jail had a <u>de facto</u> policy of not removing belts and shoe/boot laces from inmates being admitted into the jail.

It is undisputed that, although Lambert's boots were taken from him, his belt was not removed prior to his being placed in a cell at the Jail and that this was in contravention of the written policy at the Jail. It is less clear to the Court why his belt was not removed or who specifically at the Jail was responsible for ensuring compliance with the policy regarding the removal of Lambert's belt.

Deputy Ethridge was involved in questioning Lambert during the initial booking and filled out the Jail Intake card but left the booking room prior to Lambert's being escorted to his cell. <u>See</u> Deposition of Ethridge at 137-43, Exhibit No. 4 to Docket Entry No. 35. Jailers Miller and Taylor were also in the booking room with Lambert although it is not entirely clear if or how they were involved in processing him. <u>See</u> Deposition of Miller, Exhibit No. 9 To Docket Entry No. 35;

Deposition of Taylor at 178-80, Exhibit No. 6 to Docket Entry No. 35.[6] Taylor and Miller are noted on the Arrest/Booking Report as having booked Lambert, see Attachments at 63-64, Exhibit No. 2 to Docket Entry No. 35, and "P. Miller" is listed on the inventory sheet for Lambert's property. See Attachments at 287, Exhibit No. 9 to Docket Entry No. 35. Jailer Baker testified that Miller requested his assistance in transporting Lambert to his cell and that he entered the booking area, required that Lambert remove his boots, and escorted Lambert to his cell. See Deposition of Baker at 153-57, Exhibit No. 5 to Docket Entry No. 35. Jailer Taylor was also involved in escorting Lambert to his cell. See Deposition of Taylor, supra.

These factual questions, however, fail to warrant the denial of summary judgment in favor of Humphreys County. In order to succeed on her claim of municipal liability, the plaintiff must set forth more than simply evidence which shows that Jail employees did not follow the written policy which was in place. See Perez, 466 F.3d at 432. Indeed, evidence that the suicide could have been avoided if an employee had followed the Jail's policy may be indicative of negligence but suggests the lack of a link between the policy and the suicide. Id.

The plaintiff must set forth evidence showing that the actual policy in effect at the Jail regarding the removal of inmate belts and shoe laces was not the established written policy but was a de facto policy of not removing belts and shoe laces. The plaintiff must then show that this policy was adopted or ratified by Humphreys County and was done so with deliberate indifference to the consequences of such a policy. See Molton, 839 F.2d at 246.

Neither the factual disputes pointed out by the plaintiff nor the tragic nature of what occurred is sufficient to satisfy the burden required for a municipal liability claim. First, there is no proof before the Court showing that a de facto policy existed at the Jail which was contrary to the written policy for the removal of belts and shoelaces. Other than Lambert's suicide, there is only proof of one other suicide or suicide attempt involving an inmate and either his belt or shoe laces, which was

---

[6] Only portions of the depositions of Miller and Taylor were provided to the Court by the plaintiff.

a 1997 suicide by an inmate who hung himself with his boot laces.  See Deposition of Toungette at 74-76, Exhibit No. 3 to Docket Entry No. 35.

These two incidents are the only examples before the Court of newly admitted inmates who were placed in their cells without having their belts or shoe laces removed.  Given the large number of inmates who would have been booked into the Jail during this eight year time span, the Court cannot find that two isolated incidents[7] are enough to show that a de facto policy existed.

Further weighing against the finding that a de facto policy existed at the Jail is the undisputed proof that Lambert's boots were removed by Deputy Baker in accordance with the written policy prior to Lambert being placed in his cell.  As such, it is apparent that the written policy requiring the removal of belts and shoe laces was at least partially followed in the case of Lambert's booking into the Jail.  Further, the evidence shows an awareness of the written policy by the jailers, not an indifference to it.  See Deposition of Baker at 172; Deposition of Miller at 44.

There is also no proof of deliberate indifference on the part of Humphreys County with respect to requiring the removal of belts and shoe laces prior to newly admitted inmates being placed in a cell.  The undisputed proof shows that training on the written policy was part of the training received by employees at the Jail.  See Deposition of Toungette at 78.  Further, in the aftermath of the 1997 suicide, which the proof shows to be the first instance of a suicide occurring by use of a belt or shoe laces, Sheriff Toungette created a sign emphasizing the policy in bold capital letters which was posted in the booking area of the Jail.  See Deposition of Toungette at 77-78.  Thus, it is apparent that the risk of suicide presented by inmates who retained their belts and shoe laces when placed in jail cells was not ignored by Humphreys County but was in fact recognized and steps were taken to address the issue.  This fact does not show deliberate indifference.  When a municipality has taken steps to address the problem of jail suicides, even if those steps may have ultimately

_____

[7] Sheriff Toungette testified that two other suicides had occurred at the Jail.  One occurred in 1982 when an inmate used a bedsheet to hang himself and one occurred sometime between 1997 and 2005 when an inmate used the elastic waistband of his underwear to hang himself.  See Toungette Deposition at 75-76.

proven to be inadequate, the municipality has not acted with deliberate indifference.  See Molton, 839 F.2d at 246-47.

In sum, the plaintiff has simply not set forth evidence upon which a reasonable jury could find that a policy of Humphreys County was the moving force behind the alleged violation of Lambert's constitutional rights.  City of Canton, supra.


Failure To Train

The plaintiff's final Section 1983 claim is that Humphreys County failed to adequately train the employees at the Jail.  The plaintiff points out that, at the time of Lambert's death, Nidia Taylor, Bonnie Robinson, and Sheriff Toungette had not attended the 40 hour training session offered by the Tennessee Corrections Institute ("TCI").

The Sixth Circuit Court of Appeals has formulated a three-part test which requires that "[t]o succeed on a failure to train or supervise claim [under a § 1983 theory], the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Ellis v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006).  Further, if the individual employees at the Jail did not violate a constitutional right, then Humphreys County cannot be liable under Section 1983 for a failure to train. Watkins v. City of Battle Creek, 273 F.3d 682, 687 (6th Cir. 2001).  In order to make a showing of municipal liability, the plaintiff must do more than "point to something the city could have done to prevent the unfortunate incident." Kahlich v. City of Grosse Pointe Farms, 120 Fed. App'x. 580, 585 (6th Cir. 2005) (citing City of Canton, 489 U.S. at 392 (citation omitted)).

The plaintiff's failure to train claim fails because the plaintiff has simply not set forth sufficient evidence upon which a reasonable jury could find in favor of the plaintiff on this claim. All that the plaintiff has shown is that three individuals at the Jail had not received the 40 hours of

training at the Tennessee Correctional Institute regularly required for jailers.[8]  However, it is not enough to show that the individual officers in question were poorly trained.  See Cooper v. County of Washtenaw, 2007 WL 557443 (6th Cir. 2007).  The plaintiff has not shown an overall lack of training by Humphreys County of all the employees at the Jail.  Nor has the plaintiff shown that the lack of training for these three individuals caused them to be unaware of the Jail's policies.  Further, the plaintiff has not shown any evidence that the failure to have these three individuals trained was the result of a deliberate decision on the part of Humphreys County which was made with indifference to the consequences of failing to train these individuals.  Mere negligence by Humphreys County in ensuring the training of its jail employees is not sufficient to support a Section 1983 claim.  See Molton, 839 at 246-47.  Finally, the plaintiff has not shown that it was the lack of training of these two or three Jail employees, as opposed to their own individual negligence or the actions of other Jail employees, which caused or was closely related to the failure to foresee and prevent Lambert's suicide.

D. State Law Negligence Claims and the Tennessee Governmental Tort Liability Act

Humphreys County argues that this Court should not exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)[9] over the plaintiff's state law negligence claims against it because of the

---

[8] The Court notes that, although the evidence shows that neither Taylor nor Toungette had received the 40 hours of TCI training at the time of Lambert's death, the plaintiff's own proof does not clearly show this to be the case with respect to defendant Robinson.  Robinson's deposition testimony is unclear on this point and suggests that she may have received the 40 hours of training prior to March 2005.  See Deposition of Robinson at 200-01 and 203.  Indeed, the plaintiff's own brief is equivocal since the plaintiff states that "Robinson may not have attended the Tennessee Correctional Institute 40-hour training program until after Lambert died." See Docket Entry No. 35 at 12.

[9] The TGTLA claim in this case was brought based on the Court's supplemental jurisdiction. The plaintiff does not claim that federal jurisdiction exists over this claim based on diversity of citizenship.

exclusive jurisdiction provision of the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. §§ 29-20-101 et seq. The Court agrees.[10]

The TGTLA removes the common law doctrine of sovereign immunity and permits plaintiffs to sue state governmental entities, in accordance with the provisions of the act, for claims of negligence. See Tenn. Code Ann. § 29-20-205; Crawley v. Hamilton County, 193 S.W.3d 453, 456 (Tenn. 2006). Tenn. Code Ann. § 29-20-307 vests "exclusive original jurisdiction" over any action subject to TGTLA in the state circuit courts.

In Gregory v. Shelby County, 220 F.3d 433 (6th Cir. 2000), the Sixth Circuit Court of Appeals addressed the issue of federal jurisdiction over such claims in the context of a lawsuit asserting both federal civil rights claims and state law claims which were subject to the TGTLA. In affirming the district court's dismissal of the TGTLA claims, the Sixth Circuit held as follows:

> Title 28 U.S.C. § 1367(c) provides that the district courts may decline to exercise supplemental jurisdiction over a claim "if ... in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c).
>
> The Tennessee Governmental Tort Liability Act ("TGTLA"), T.C.A. § 29-20-101 et seq., provides in pertinent part: "[t]he circuit courts shall have exclusive original jurisdiction over any action brought under this chapter...." Tenn. Code Ann. § 29-20-307.
>
> In this instance, the Tennessee legislature expressed a clear preference that TGTLA claims be handled by its own state courts. This unequivocal preference of the Tennessee legislature is an exceptional circumstance for declining jurisdiction.

220 F.3d at 446.

This Court has previously decided that it should not exercise jurisdiction over actions for negligence under the TGTLA and that dismissal of TGTLA claims is required. Buchanan v. Williams, 434 F. Supp. 521, 533 (M.D.Tenn. 2006); Fromuth v. Metropolitan Gov't. of Nashville, Division County, Tennessee, 158 F. Supp. 2d 787, 789 (M.D.Tenn. 2001); Spurlock v. Whitley, 971 F. Supp. 1166 (M.D. Tenn. 1997), aff'd sub nom. Spurlock v. Satterfield, 167 F.3d 95 (6th Cir.

---

[10] The Court notes that the plaintiff has a parallel lawsuit which is pending in state court. See Plaintiff's Brief (Docket Entry No. 35) at 33-34.

1999); Timberlake v. Benton, 786 F. Supp. 676 (M.D.Tenn. 1992); Beddingfield v. City of Pulaski, 666 F.Supp. 1064 (M.D.Tenn. 1987), rev'd on other grounds, 861 F.2d 968 (6th Cir. 1988).

Alternatively, upon the Court's dismissal of the plaintiff's Section 1983 claims, the Court no longer has original jurisdiction over any of the claims asserted by the plaintiff in this action. As such, the Court declines to exercise supplemental jurisdiction over any state law claims raised by the plaintiff. See 28 U.S.C. § 1367(c)(3) (a district court may decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction").

Accordingly, the plaintiff's state law negligence claims against Humphreys County shall be dismissed without prejudice for jurisdictional reasons.[11]

## CONCLUSION

Based on the foregoing, the defendants' motion for summary judgment (Docket Entry No. 22) will be GRANTED.

An appropriate order will enter.

Juliet Griffin

JULIET GRIFFIN
United States Magistrate Judge

---

[11] The TGLA addresses the liability of governmental entities only and its jurisdictional limitations do not apply to persons sued individually. See Timberlake v. Benton, 786 F. Supp. 676, 697 (M.D.Tenn. 1992). Accordingly, state law claims against defendant Robinson in her individual capacity would not be required to be dismissed for the jurisdictional reasons raised by the TGTLA. However, because the Court finds that dismissal of the plaintiff's Section 1983 claims is warranted, the Court declines to exercise supplemental jurisdiction over any state law claims against defendant Robinson under 28 U.S.C. § 1267(c) and finds that these claims should likewise be dismissed without prejudice.

24